**Patrick WEST, Plaintiff,**

v.

**INNOTRAC CORPORATION, a Georgia Corporation, and Does I through X, inclusive Defendants.**

No. 3:05CV00394–ECR(RAM).

United States District Court,
D. Nevada.

Nov. 29, 2006.

Stephen S. Kent, Woodburn and Wedge, Reno, NV, for Plaintiff.

Margo Piscevich and Mark J. Lenz, Piscevich & Fenner, Reno, NV, Stephen E. Hudson, Kilpatrick Stockton LLP, Atlanta, GA, for Defendants.

### Order

EDWARD C. REED, JR., District Judge.

This case comes to us on cross motions for summary judgment (# 38 & # 39). Plaintiff's motion for partial summary judgment (# 38) seeks summary judgment on the breach of contract claim, and Defendants' motion (# 39) seeks summary judgment on all of Plaintiff's remaining claims. By our Order (# 20), we dismissed Plaintiff's Third Claim (fraud or intentional misrepresentation), Fifth Claim (breach of duty of care), Sixth Claim (intentional omissions or failure to disclose), Seventh Claim (breach of fiduciary duty),

Eighth Claim (general negligence), and Twelfth Claim (Nevada RICO claims).[1] Plaintiff's remaining claims allege: breach of contract (First Claim); breach of the implied covenant of good faith and fair dealing (Second Claim); violation of § 12(a)(2) of the Securities Act of 1933 (Ninth Claim)[2]; violation of § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("S.E.C.") Rule 10b–5 (Tenth Claim); violation of NRS 90.570 and NRS 90.660(1) (material untrue statements in relation to the sale of a security), NRS 90.580 and NRS 90.660(3) (manipulation of the market), and NRS 90.605 (offering false evidence) (Eleventh Claim); and punitive damages (Thirteenth Claim).

Plaintiff presented his motion for partial summary judgment (# 38) on August 31, 2006, arguing for summary judgment on the breach of contract claim. Defendants submitted their opposition (# 51), and Plaintiff replied (# 60). Defendants presented their motion for summary judgment on Plaintiff's remaining claims on August 31, 2006. Plaintiff opposed (# 53; # 55),[3] and Defendants replied (# 59). We heard oral arguments on the cross-motions for summary judgment (# 38; # 39) on November 14, 2006(# 65).

In this order, we only deal with the portion of Defendants motion (# 39) seeking summary judgment on Plaintiff's claim under § 12(a)(2) of the Securities Act of 1933. All other issues in these cross mo-

tions for summary judgment (# 38 & # 39) have been disposed of in a separate order issued concurrently with the instant order.

## I. BACKGROUND

Plaintiff, Patrick West, was an owner of UDS when he and the other owners and shareholders entered into a Merger Agreement with Innotrac on December 8, 2000 (Defs.' Mot. For Summ. J. (# 39), Ex. F, Merger Agreement). Under the agreement, Innotrac became the surviving corporation and UDS became a division of Innotrac(Merger Agreement). Patrick West also entered into an employment agreement with Innotrac on December 8, 2000 (Defs.' Mot. For Summ. J. (# 39), Ex. G, Employment Agreement). As part of the Employment Agreement, Mr. West was to be granted stock options for 50,000 shares of Innotrac stock that would vest in accordance with a specified schedule and was "subject to the terms and conditions set forth in a separate option agreement and subject to the terms and conditions of the stock option plan" (Employment Agreement ¶ 3.1(f)). At the time, the 2000 Stock Option and Incentive Award Plan was in effect (Defs.' Mot. For Summ. J. (# 39), Ex. K, Plan; Decl. Of Martin J. Blank ¶ 4 (# 40–10)). Defendants also allege that at the time Innotrac was using a standard form option agreement (Blank Decl. ¶ 5). On December 22, 2000, Innotrac's Board of Directors executed a written consent to the grant of options for

---

1. By his motion (# 57), Plaintiff requested leave to file a second amended complaint to modify his Nevada RICO claim. Plaintiff's motion (# 57) was denied by our Order (# 64) on November 13, 2006. All references in this Order are to Plaintiff's first amended complaint (# 12).

2. To the extent that Defendants' motion for summary judgment (# 39) seeks summary judgment on Plaintiff's claim under § 12(a)(2) of the Securities Act of 1933, it is dealt with

in our separate Order released concurrently with the present Order.

3. Plaintiff's Opposition (# 53) contained supporting exhibits and only one page of his opposition. Plaintiff's full opposition was filed as Errata to Plaintiff's Opposition to Defendants' motion for Summary Judgment (# 55). In this Order, references to Plaintiff's opposition will cite Errata to Plaintiff's Opposition (# 55), but references to the exhibits will cite Opposition (# 53).

50,000 shares to Mr. West (Blank Decl. (# 40–10), Ex. A, Written Consent). Defendants allege that in December 2000, David Gamsey gave Mr. West the alleged option agreement (Defs.' Mot. For Summ. J. (# 39), Ex. L, Alleged Option Agreement)[4] referred to in the Employment Agreement and obtained a signed copy from him the following day (Defs.' Mot. For Summ. J. 7 n. 5 (# 39)). Mr. West denies having ever seen the purported option agreement (Defs.' Mot. For Summ. J. (# 39), Ex. A, Depo. Of Patrick West 137:19–138:6). The copy of the alleged option agreement supplied by Defendants, which includes a signature page they allege was found in Mr. West's Reno personnel file (Defs.' Mot. For Summ. J. (# 39), Ex. D, Depo. Of Laurie Valentine 27:2–28:13), is missing the first page. It is agreed that the first page contained information on the grantee and the number of shares (Defs.' Reply 6 n. 1 (# 59)), but Plaintiff claims it also contained an expiration date (Pl.'s Reply 5–6(# 60); Defs.' Mot. For Summ. J. (# 39), Ex. C, Depo. Of David Gamsey 48:19–49:5).

Two years later, on December 5, 2003, Mr. West sent an e-mail to David Gamsey concerning his stock options. In it, he said: "Can you tell me what I need to do to exercise stock options? I am looking to do this in January" (Pl.'s Mot. For Partial Summ. J. (# 38), Ex. 7, Patrick West E-Mail, 12/05/2003). Later that month, Mr. West met with Scott Dorfman, Innotrac's chief executive officer. Mr. Dorfman told Mr. West that the IPOF fund was the sole buyer of Innotrac stock and that David Dadante of the IPOF fund had requested that executives not "sell into him" by exercising their shares (Defs.' Mot. For Summ.

J. (# 39), Ex. B, Depo. Of Scott Dorfman 153:8–155:24). He also indicated that a private placement or financing mechanism would be arranged for executives to sell their stocks (West Depo. 176:6–171:7).

Mr. West made no further efforts at exercising his options for one year. In the interim, Mr. West terminated his employment with Innotrac in March 2004 (First Am. Compl. ¶ 30m (# 12)). Approximately nine months later, in January 2005, Mr. West attempted to exercise his options through his stockbroker (West Depo. 178:24–179:12). Innotrac indicated that he could not exercise his options because they had expired pursuant to a 90–day expiration provision in the alleged option agreement. Innotrac represented to Mr. West that he had signed the alleged option agreement and his options were subject to the limitations contained therein (West Depo. 180:9–184:5; Pl.'s Mot. For Partial Summ. J. (# 38), Ex. 13, Dorfman E-mail, 02/03/2005).

Mr. West then filed the instant lawsuit in the Second Judicial District Court of the State of the Nevada, in and for the County of Washoe, on June 16, 2005 (Notice of Removal 4(# 2)). Defendants removed the action to the United States District Court for the District of Nevada on July 11, 2005 (Notice of Removal (# 2)). Plaintiff filed his first amended complaint on August 15, 2005(# 12).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists. *Northwest Motorcycle Ass'n v. U.S. Department of Agricul-*

---

**4.** The first page of the purported option agreement is missing, and Plaintiff alleges that the signature on the final page is not his. Because the central issue in this claim is whether Plaintiff's options were subject to the terms set forth in this document, we do not in this order refer to it as the option agreement; rather, we refer to it as the alleged or purported option agreement.

*ture,* 18 F.3d 1468, 1471 (9th Cir.1994). The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. Fed.R.Civ.P. 50(a). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the parties may submit evidence in an inadmissible form—namely, depositions, admissions, interrogatory answers, and affidavits—only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c); *Beyene v. Coleman Security Services, Inc.,* 854 F.2d 1179, 1181 (9th Cir.1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Summary Judgement is not proper if material factual issues exist for trial. *B.C. v. Plumas Unified Sch. Dist.,* 192 F.3d 1260, 1264 (9th Cir.1999). "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputes over irrelevant or unnecessary facts should not be considered. *Id.* Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. *Id.*

### III. ANALYSIS

In his ninth claim for relief, Plaintiff alleges a violation of § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2). A defendant is liable under section 12(a)(2) when he or she

> offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading.

This language sets forth four elements for liability. First, there must be an offer or sale of a security. Second, the offer or

sale must be made by the use of any means of interstate commerce or the mails. Third, as discussed below, the offer must be made by means of a prospectus. Finally, the prospectus or an oral communication relating to the prospectus must include an untrue statement or omission of a material fact.

In his second amended complaint, Plaintiff indicates that the stock options were an interstate offer to sell securities in satisfaction of the first two elements (Pl.'s First Amended Compl. ¶ 79(# 12)). With respect to the last element, he argues that Defendants made oral statements that were untrue and/or omitted material facts when Plaintiff attempted to exercise his stock options (Pl.'s First Amended Compl. ¶ 79(# 12)). Plaintiff has not explicitly argued that the alleged oral statements were made with regard to a prospectus, and Plaintiff appears to read the law as literally only requiring a "prospectus *or* oral communication." The Supreme Court, however, has acknowledged agreement among the circuits that any alleged oral communications under section 12(2)(a) must be made with regard to a prospectus.[5] The central question is therefore whether there was a prospectus about which the alleged oral untrue statements were made.

Defendants present two arguments for summary judgment on this cause of action. They argue summary judgment is appropriate because Plaintiff did not acquire his options as part of a public offering (Defs.' Mot. For Summ. J. 21–23(# 39)) and be-

cause he has no cognizable damages under section 12(a)(2).

## A. Public Offering

Defendants rely primarily on *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), in arguing that there was no public offering when Plaintiff was granted his stock options and therefore, no violation of section 12(a)(2). The main holding of *Gustafson* focuses on the definition of "prospectus" in section 12(a)(2). The Supreme Court confined the definition of "prospectus" in the Securities Act to a "document[ ] related to [a] public offering[ ] by an issuer or its controlling shareholders." *Id.* at 569, 115 S.Ct. 1061. Defendants allege that without a public offering, there can be no violation of section 12(a)(2). This can be understood as an argument that Plaintiff cannot show that there was a prospectus because there was no public offering connected with the granting of Plaintiff's stock options.

At oral argument (# 65) and in his opposition (# 55), Plaintiff sought to distinguish this case from *Gustafson* by focusing on the fact that the issuer, Innotrac, granted the stock options in this case. In contrast, *Gustafson* dealt with the sale of stocks by a company's sole shareholders. 513 U.S. at 564, 115 S.Ct. 1061. The Supreme Court's decision, however, does not appear to distinguish between a sale by controlling shareholders and a sale by the issuer. In fact, the Supreme Court, in defining "prospectus," specifically noted that "a prospectus . . . is confined to documents

---

5. While the Act states "prospectus or oral communication", the Supreme Court has acknowledged that those Courts of Appeals which have interpreted this phrase (namely the Third and Seventh Circuits) have restricted "oral communication[s]" to those oral communications relating to a prospectus. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 567–68, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("The Courts of Appeals agree that the phrase 'oral communication' is restricted to oral communications that relate to a prospectus.") (*citing Pacific Dunlop Holdings Inc. v. Allen & Co. Inc.*, 993 F.2d 578, 588 (7th Cir.1993); *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 688 (3d Cir.1991)). Liability under this section always requires a prospectus; the untrue statement or omission may be in the prospectus itself or in an oral communication concerning the prospectus.

related to public offerings *by an issuer or its controlling shareholders.*" *Id.* at 569, 115 S.Ct. 1061 (emphasis added). Plaintiff's proposed distinction between the facts of *Gustafson* and the facts at bar is therefore unpersuasive.

Plaintiff also argues that there was in fact a public offering in connection with the granting of stock options. He points to Innotrac's filings with the S.E.C., namely a public registration statement in connection with Innotrac's 2000 Stock Option and Incentive Award Plan (Pl.'s Opp. (# 53), Ex. 8, Form S–8) and Innotrac's 2000 Annual Report to the S.E.C. (Pl.'s Opp. (# 53), Ex. 7, Form 10–K). Plaintiff, however, does not offer a definition or test for "public offering" under which these documents would establish a "public offering."

■ In analyzing Defendants' motion (# 39) for summary judgment on this issue, the key issue is the definition of "public offering." Defendants seem to argue for a literal definition of the term. Plaintiff proposes no alternative definition. Thus far, no federal court has published a decision applying the holding of *Gustafson* in the context of employee stock options.[6] Therefore, this is a case of first impression on this issue.

### (1) The Definition of "Public Offering"

Justice Kennedy, in writing for the five person majority in *Gustafson,* defines "prospectus" so as to require it to be produced in connection with a public offering of securities. He writes, "[We] hold[ ] that the term 'prospectus' relates to public offerings by issuers and their controlling shareholders." *Id.* at 1070. The opinion concludes by saying, "In sum, the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." *Id.* 1073–74. The term "public offering," however, is never defined in *Gustafson.*

■ Defendants propose a strict definition of "public offering." Under this definition, only offers to the public at large would constitute public offerings. By extension then, any offer of employee stock options would not qualify as a public offering. Defendants do not offer any authority to support the application of this literal definition in § 12(a)(2) claims.

A more flexible definition of "public offering," however, can be found in federal securities laws. The jurisprudence under § 4(2) of the Securities Act of 1933 is particularly useful. Section 4(2) offers an exemption for "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(2). The seminal Supreme Court case of *S.E.C. v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), provides a framework for analyzing whether an offering is private or public. Arguably, when the majority in *Gustafson* used the term "public offering," they were using the term as it had been defined in *Ralston Purina* and its progeny.[7]

---

**6.** We do know, however, that for the purposes of § 12(a)(2), the granting of stock options qualifies as a sale of those stocks. The Ninth Circuit, relying on the Supreme Court's opinion in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), has noted that "[t]he grant of an employee stock option on a covered security is ... a 'sale' of that covered security" under section 12(a)(2). *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1129–30 (9th Cir.2002).

**7.** We are not alone in linking § 4(2) with *Gustafson.* As the Southern District of Florida noted when compiling cases on the issue, "The majority of courts ... have interpreted *Gustafson* to mean ... that an offering that is exempt from registration pursuant to Section 4(2) is not subject to Section 12(a)(2) liability." *Faye L. Roth Revocable Trust v. UBS Painewebber,* 323 F.Supp.2d 1279, 1289 (S.D.Fla.2004). It does not appear, however, that a court has yet defined "public offering"

In *Ralston Purina*, the Court noted that whether an offering is public or private turns on whether the particular class of persons affected needs the protection of the Act. *Id.* at 126, 73 S.Ct. 981. While there is not much jurisprudence on employee stock option plans, Congress appears to have recognized that some employees need the Act's protections. When the Securities Exchange Act of 1934 was in committee, an amendment to the Securities Act of 1933 that would have specifically exempted employee benefit plans [8] was rejected. The House noted that employees "may be in as great need of the protection afforded by availability of information concerning the issuer for which they work as are most other members of the public." H.R.Rep. No. 1838, at 41 (1934).

■ Courts have developed flexible tests to determine whether a transaction involves a public offering. These tests focus on four factors: "(1) the number of offerees; (2) the sophistication of the offerees; (3) the size and manner of the offering; and (4) the relationship of the offerees to the issuer." *S.E.C. v. Murphy*, 626 F.2d 633, 644–45 (9th Cir.1980) (citations omitted). For an offering to be private, the test must be met with respect to each purchaser and offeree. *Id.* at 645.

*Ralston Purina* and its progeny define "public offering" specifically in the context of the Securities Act of 1933. Therefore, we can assume that Justice Kennedy chose to use the phrase as it is therein defined. Furthermore, the logic of *Gustafson* supports application of the *Ralston Purina* test to determine if an offering is public and indicates that the decision was not

meant to bar all § 12(a)(2) claims arising from the issuance of employee stock options.

■ The majority opinion in *Gustafson* seeks to interpret the Securities Act as "a symmetrical and coherent regulatory scheme," and looks to the use of the word "prospectus" in § 10(a) to understand its meaning in the context of § 12(a)(2). Section 10(a) mandates that "a prospectus relating to a security ... shall contain the information contained in the registration statement." 15 U.S.C. 77j(a). A § 10(a) prospectus is not required to be produced in every instance. Therefore, the Court reasoned:

> An examination of § 10 reveals that, whatever else "prospectus" may mean, the term is confined to a document that, absent an overriding exemption, must include "the information contained in the registration statement." By and large, only public offerings by an issuer of a security, or by controlling shareholders of an issuer, require the preparation and filing of registration statements. It follows, we conclude, that a prospectus under § 10 is confined to documents related to public offerings by an issuer or its controlling shareholders.

513 U.S. at 569, 115 S.Ct. 1061 (citation omitted). The majority further noted that "the liability imposed by § 12[ (a) ] (2) cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption [9])." 513 U.S. at 571, 115 S.Ct. 1061. In *Gustafson*, there was no dispute that the private sale of securities at issue was not a public

under *Gustafson* in conformity with § 4(2) jurisprudence when a § 4(2) exemption is not involved.

**8.** In the context of securities, employee benefit plans include employee stock options. "The term employee benefit plan means any written purchase, savings, option, bonus, ...

incentive, pension or similar plan or written compensation contract solely for employees, directors, ... officers, or consultants or advisors." 17 C.F.R. § 230.405 (2006).

**9.** Exemptions are set forth in § 3, 15 U.S.C. § 77c. 513 U.S. at 569, 115 S.Ct. 1061.

offering; the Supreme Court therefore concluded that the contract of sale was not a prospectus. By restricting § 12(a)(2) liability to cases where a prospectus was required to be produced, the Supreme Court in *Gustafson* confines liability to "misstatements contained in [or referring to [10]] a document prepared with care" and excludes liability arising from "casual communication[s] between buyer and seller in the secondary market." *Id.* at 578, 115 S.Ct. 1061.

There is no language in *Gustafson* indicating that a "public offering" should be strictly defined as an offering made to the public at large. Rather, the Court notes that a prospectus is only required in a public offering, and it restricts § 12(a)(2) liability to instances where registration and a § 10(a) prospectus are required because the offering is public. *Ralston Purina,* which held that the offer of stock to employees by an employer may constitute a public offering requiring registration, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494, indicates that in some employment situations, an offering may be public. Furthermore, the S.E.C. Rules make it clear that registration and a § 10(a) prospectus may be required for the grant of stock options under a stock option and incentive award plan. Rule 428 specifically defines what constitutes a prospectus in satisfaction of § 10(a) in the context of employee benefit plans. 17 C.F.R. 230.428 (2006). The employee benefit plans covered by Rule 428 are defined by Rule 405 to include option plans for employees and officers. 17 C.F.R. 230.405 (2006). Therefore, we are not required to find that the granting of employee stock options under an option plan is necessarily a private offering. Rather, the appropriate inquiry is to apply the *Ralston Purina* test to the facts at bar and determine whether the grant of stock options under the plan was a public offering necessitating registration and the production of a prospectus.[11]

### (2) Application of Ralston Purina

As previously noted, the courts have set forth a non-exclusive list of four factors to consider in determining whether there is a public offering under *Ralston Purina:* "(1) the number of offerees; (2) the sophistication of the offerees; (3) the size and manner of the offering; and (4) the relationship of the offerees to the issuer." *S.E.C. v. Murphy,* 626 F.2d 633, 644–45 (9th Cir. 1980) (citations omitted). These factors are intended to aid courts in answering the central question in *Ralston Purina:* whether the class of offerees needs the protection of the Securities Act's provisions. 346 U.S. at 126, 73 S.Ct. 981. In determining whether a public offering exists, courts are to look to the characteristics of each offeree.

---

**10.** Section 12(a)(2) expressly imposes liability for oral communications. The Supreme Court has tacitly acknowledged that liability for oral communications is restricted to oral communications made about a prospectus. 513 U.S. at 567–68, 115 S.Ct. 1061.

**11.** During oral arguments (# 65), Defendants contended that there could be no public offering in this case because there was no prospectus. Under Rule 428, a prospectus for an employee benefit plan consists of (1) the employee benefit plan information (here, the 2000 Stock Option and Incentive Award Plan); (2) a statement of the availability of registrant information, employee benefit plan annual reports, and other required information; and (3) the annual reports and documents incorporated by reference in Item 3 of the Form S–8 Registration. It appears that Innotrac produced documents, including the 2000 Stock Option and Incentive Award Plan, that would constitute a § 10(a) prospectus under Rule 428. As such, we decline to find that Innotrac did not produce a prospectus and therefore did not engage in a public offering as Defendants contend. Rather, we apply *Ralston Purina* to determine whether it was a public offering necessitating the production of a prospectus.

■■■■■■■■■■■

■ At oral argument, Defendants contended that the offering at issue was not public under *Ralston Purina* because the number of offerees was small and the offerees were generally sophisticated. Defendants also indicated that because the options were granted as awards, the nature of the offering indicated that the offering was not public.

■ With regard to the number of offerees, courts have routinely held that this factor is not dispositive; there may be instances where there are few offerees but the offering is nonetheless public. *Murphy*, 626 F.2d at 645. The Employment Agreement at issue only gave the right to the grant of stock options to Mr. West, and the Written Consent of the Compensation Committee only granted stock options to nine individuals. But, the scope of the offering extends beyond the Written Consent and the Employment Agreement because other options were granted in an integrated offering. There are five factors which determine whether apparently separate offerings are considered to be part of one integrated offering in a public offering analysis: (1) whether the offerings were part of a single plan of financing; (2) whether the offerings involved issuance of the same class of securities; (3) whether the offerings were made at or about same time; (4) whether the same kind of consideration was to be received for the securities; and (5) whether the offerings were made for the same general purposes. *Murphy*, 626 F.2d at 645. Based on these factors, we treat all grants and awards made under the 2000 Stock Option and Incentive Award Plan as part of an integrated offering for the purposes of deciding Defendants' motion (# 39) for summary judgment. The evidence before the Court indicates that more than nine individuals received options under the Plan; on the same day that options were granted to these nine individuals, thirty-one former UDS employees were granted stock options under the Plan (Blank Decl. (# 40–10), Ex. C). We therefore have evidence of options having been granted to forty individuals under the Plan on December 8, 2000.

Defendants also argue that the grantees were sophisticated individuals. For this contention, they rely on a Regulation D certificate [12] signed by Plaintiff (Defs.' Mot. To Dismiss (# 39), Ex. H, Regulation D Certificate). Through this certificate, Mr. West indicates that he "has such knowledge and experience in financial and business matters that such person or estate is capable of evaluating the merits and risks of an investment in the securities of INNOTRAC CORPORTATION" (Regulation D Certificate). While the certificate indicates Plaintiff's sophistication, it does not indicate any level of sophistication with regard to other employees who received options or stock awards under the Plan.

With regard to the size and manner of the offering, Defendants argued (# 65) that the manner of the offering is indicative of a private offering. They contended that because employees did not pay for the options or awards granted under the Plan, they would not turn down options or shares offered under the Plan. Therefore, one could infer that employees did not need the protection of the Act to decide whether to participate in the Plan. This argument, however, ignores the role that stock options play in employee recruitment and retention. Innotrac's Plan acknowledges the value of stock options in

12. A Regulation D certificate exempts a sale of securities from registration under § 4(6) of the Securities Act, 15 U.S.C. § 77d(6), and Regulation D promulgated under the Act, 17 C.F.R. § 230.500 et seq. (2006). It appears that Mr. West signed this certificate in connection with a grant of shares under the merger.

attracting and retaining employees: "The purposes of the Plan [include] provid[ing] flexibility to the Company in its ability to motivate, attract and retain the services of Participants upon whose judgment, interest and special effort the successful conduct of its operation largely depends" (Defs.' Mot. For Summ. J. (# 39), Ex. K, Plan ¶ 1.2). Viewing the evidence in the light most favorable to Plaintiff, options and awards were granted by Innotrac to attract and retain employees. Employees, therefore, might need the disclosures required under the Act to decide whether the compensation (including options and awards) offered by Innotrac would be more or less favorable than that offered by another potential employer. As to the size of the offering, we have evidence of 545,000 shares being subject to options granted under the Plan on December 22, 2000. The value of these options, of course, varies with the fluctuation of the market. But, viewing the evidence in the light most favorable to Plaintiff, these options were worth as much as $4.29 million.[13]

Finally, as to the relationship between the offeror and offerees, "[a] court may only conclude that the investors do not need the protection of the Act if all the offerees have relationships with the issuer affording them access to or disclosure of the sort of information about the issuer that registration reveals." *S.E.C. v. Murphy*, 626 F.2d at 647. Plaintiff, as the president of Innotrac's Reno division, appears to have had a relationship with Innotrac that would allow his decisions regarding his stock options to be informed

without the disclosure required under the Act. This, however, must be true with regard to each offeree under the Plan in order for the grant of options to be private. Especially with regard to the thirty-one former UDS employees who were granted options under the December 22, 2000 consent, it does not appear that all the offerees had such a relationship with Innotrac. Furthermore, eligibility under the Plan was not restricted to directors and officers of Innotrac. The Plan provides that "[a]ny Director or Employee of the Company or of any Subsidiary, or any independent contractor, adviser or consultant to the Company or any Subsidiary, whose judgment, initiative and efforts contribute or may be expected to contribute materially to the successful performance of the Company or any Subsidiary shall be eligible to receive an Award under the Plan" (Plan, art. 5). The Plan, therefore, does not restrict the pool of offerees to those whose relationship with Innotrac obviates the need for disclosure under the Act.

These four factors and the evidence before the Court indicate that a genuine issue of material fact exists with regard to whether the offering at issue was public or private. Therefore, we decline to find the offering was private and deny Defendants' motion (# 39) for summary judgment on this point.

### B. Remedies under § 12(a)(2)

 Defendants also argue for summary judgment on the § 12(a)(2) claim because, they assert, Plaintiff has no claim

---

**13.** This calculation assumes that the other options of which we have evidence were issued at $3.125 per share. It appears that Innotrac stock reached a peak of at least $11 per share (Defs.' Mot. For Summ. J. (# 39), Ex. Q, Randal S. Kuckenmeister Letter). Therefore, the offering may have been for options worth over four million dollars. The valuation of options, however, is inherently speculative. Some employees may choose not to exercise their options and others might exercise their options at times when the stock is trading at more moderate levels. But, viewing the evidence in the light most favorable to the non-moving party, the size of the offering was not necessarily small.

for rescission or rescission-like damages under § 12(a)(2). If a person is liable under § 12(a)(2),

> [The purchaser m]ay sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. 77l. The Supreme Court has said, "Even in [a situation where the plaintiff no longer owns the security], we may assume that a rescissory measure of damages will be employed; the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by any 'income received' on the security." *Randall v. Loftsgaarden,* 478 U.S. 647, 655–56, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986).

Defendants argue that Plaintiff will not be able to show damages because Plaintiff did not pay for the securities and because he has only retained an expert witness to determine the market value of the options at various times. These contentions do not support summary judgment on this claim.

As our order (# 20) made clear, Plaintiff need not show that he paid for the options to receive damages. The Ninth Circuit, in *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1129–1130 (9th Cir.2002), noted, "The grant of an employee stock option on a covered security is . . . a 'sale' of that covered security." The Securities Act of 1933 itself clearly provides that the word "sale" encompasses the grant of employee stock options. Section 3 of the Securities Act defines the term "sale" as including "every contract of sale or disposition of a security or interest in a security for value." 15 U.S.C. § 77b(a)(3). The Act includes "options" in its definition of "security." Securities Act § 3(a)(1), 15 U.S.C.

77b(a)(1). The granting of stock options therefore fits within the Act's definition of "sale" as long as the grant is "for value." In his opposition to Defendants' motion (# 39), Plaintiff notes that he "gave substantial consideration for his stock options—the merger and three years of employment" (Errata to Pl.'s Opp. 38(# 55)). The Employment Agreement is evidence that Plaintiff received the stock options as consideration for his employment with Innotrac (Defs.' Mot. For Summ. J. (# 39), Ex. G, Employment Agreement). The grant of options was "for value" and therefore a sale.

Because the grant of stock options is a sale under § 12(a)(2), a proper interpretation of the remedies provision of § 12(a)(2) must allow for recovery in a proper case involving the grant of stock options. There appears to be no case law dealing with remedies in the context of employee stock options, so this is a case of first impression. Defendants read § 12(a)(2) as requiring that a plaintiff pay money for stock or stock options in order to recover. This interpretation would exclude recovery in any case where an employee is granted stock options as part of his or her compensation for employment. It is inconsistent with our prior order (# 20) and would virtually exclude employee stock options from the ambit of § 12(a)(2).

Defendants further argue that Plaintiff will not be able to show cognizable damages (i.e., damages based on consideration). Plaintiff need not at this stage calculate his damages; it is sufficient to demonstrate that there are cognizable damages. Viewing the record before us in the light most favorable to Plaintiff, it appears that Plaintiff can show at trial that part of his compensation for his employment with Innotrac was the grant of exercisable stock options (Defs.' Mot. For Summ. J. (# 39), Ex. G, Employment

Agreement ¶ 3.1, Compensation). He can therefore demonstrate damages. To survive summary judgment on this issue, he need not present evidence on the precise calculation of damages.

Defendants contend that Plaintiff does not seek damages based on his contribution of labor, and therefore the damages he seeks do not fit within § 12(a)(2) and the language of our order (# 20). In making this argument, Defendants rely on the fact that Plaintiff's damages expert, Randy Kuckenmeister, has calculated Plaintiff's alleged damages as the difference between the stock price in January 2004 and the strike price at grant (Def.'s Mot. For Summ. J. 25(# 39); Def's Mot. For Summ. J. (# 39), Ex. Q, Randal S. Kuckenmeister Letter).

In his opposition (# 55), Plaintiff notes that he does not need an expert to recover damages and is allowed to plead alternative theories for the recovery of damages. Defendants' response says, "Plaintiff has come forward with no evidence to show that he parted with anything of value for his options or that he has [paid] any legally cognizable consideration" (Def.'s Reply 12(# 59)). It is, however, undisputed that the stock options were part of West's Employment Agreement. Viewing the evidence in the light most favorable to Plaintiff and making all inferences in his favor, Plaintiff received his stock options as compensation for his labor, and therefore has legally cognizable damages under § 12(a)(2).[14]

***IT IS THEREFORE HEREBY ORDERED THAT*** Defendants' motion for summary judgment (# 39) is ***DENIED*** insofar as it seeks summary judgment on Plaintiff's ninth claim for relief (liability under § 12(a)(2) of the Securities Act of 1933).

---

14. Plaintiff also argues that § 12(a)(2) allows him to calculate damages by subtracting the strike price from the average trading price in January 2004. He cites no cases in support of this argument and does not argue why such a calculation would be appropriate under the case law interpreting § 12(a)(2). Our previous order (# 20) and § 12(a)(2) do not allow for such a calculation of damages.