Opinion filed April 30, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed April 30,
2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                  ___________

 

                                                          No. 11-07-00314-CV 

                                           __________

 

               KEY ENERGY SERVICES, INC., Appellant/Cross-Appellee,

 

                                                             V.

 

                        JOSEPH
B. EUSTACE, Appellee/Cross-Appellant

 



 

                                         On
Appeal from the 238th District Court

 

                                                        Midland
County, Texas

 

                                                 Trial
Court Cause No. CV45415

 



 

                                                                   O
P I N I O N

 This
is an employment dispute.  Key Energy Services, Inc. terminated Joseph B.
Eustace and he sued, alleging contract, securities, and tort causes of action. 
The trial court granted summary judgment for Key on Eustace=s securities fraud claim
and, at trial, directed a verdict against him on his tort claims.  The jury
found for Eustace on his contract claim, and he was awarded $724,500 for lost
stock options, $180,000 for lost severance payments, and attorney=s fees of $295,000.  We
affirm in part and reverse and render in part.

 








                                                             I. 
Background Facts

In
1999, Key employed Eustace to serve as its Group Vice President B Gulf Coast Region. Eustace
participated in an incentive compensation program known as Key=s 1997 Incentive Plan, and
he received a number of stock options.  In 2001, the parties signed a
three-year employment agreement effective September 4, 2001.  The agreement
contained a termination provision.  If Eustace terminated his employment, if
Key elected not to extend his contract, or if Key terminated him for cause, he
was entitled to minimal benefits.  If, however, Key otherwise terminated his
employment, Eustace was entitled to his annual base salary as severance
compensation.

Eustace=s area of responsibility
included the South Texas Division.  John Crisp was the South Texas Division manager. 
Following an internal audit in September and October 2003, Key decided to
perform a full-scale investigation of the South Texas Division.  Initially, Key
was concerned about reports of missing swab units.  However, the investigation
revealed that much more equipment was missing, that Crisp was forming competing
companies, and that he was converting Key=s
equipment for their benefit.  In December, Key decided to terminate Crisp. 
Eustace offered to resign in light of the investigation, but Key=s CEO, Fran John, declined
the offer and instructed him to fix the situation.  That same month, Key=s Board of Directors voted
Eustace 40,000 shares of restricted stock.

Key
had recently acquired Cactus Trucking, a business located within the South
Texas Division.  The day before Crisp was terminated, Eustace met with Cactus=s former owner, Todd
Williams.  He was working for Key as a consultant, and Eustace wanted to
discuss retaining Cactus=s
customers.  Eustace had been instructed to keep Crisp=s impending termination quiet, but during their
meeting, he told Williams that Key would terminate Crisp the next day. 
Williams alerted Crisp who then deleted several files from his computer.








Key
was unable to file its 10-K in March 2004 because it knew that prior year
financial statements were inaccurate and required restatement.  On March 29,
2004, Key issued a press release announcing a write-down of approximately $78
million of assets.[1]  On April 8,
Key temporarily suspended the exercise of options for its common stock pending
completion of the restatement process.

Key
decided to terminate Eustace.  Richard James Alario, who was hired as Key=s COO in January 2004 and
who, at the time of trial, was Key=s
Chairman of the Board and CEO, asked Lonnie Hobbs, Key=s Associate General Counsel, to determine if
the termination would be with or without cause.  Hobbs was involved in the
initial investigation of missing assets and the 2003 internal audit, and he
participated in the investigation and litigation following the discovery that
Crisp deleted several computer files prior to his termination.  Hobbs reviewed
Eustace=s employment
agreement and determined that cause existed.  On April 20, 2004, Eustace was
terminated.  He was given a letter stating that he was being terminated for
cause and that his stock options were canceled, but without specifying the
grounds for his termination.  At the time, Eustace had 140,000 vested options. 

                                                                       II. 
Issues

Key
challenges the judgment with two issues.  Key argues first that it has no
liability to Eustace because, as a matter of law, it had cause to terminate
him.  Alternatively, Key argues that Eustace=s
stock option claim is barred because, even if he was not terminated for cause,
his stock options otherwise expired before they could have been exercised. 
Eustace has filed a cross-appeal.  Eustace contends that the trial court erred
by valuing his stock options as of the date of his termination rather than on
the date the restriction on trading Key=s
stock was lifted.

                                                        III. 
Analysis

 
A.  Did Key, as a Matter of Law, Terminate Eustace for Cause?

The
jury found that Key failed to comply with Eustace=s
employment and stock option agreements.  Key argues initially that the trial
court erred by rendering judgment on the verdict because, as a matter of law,
it had cause to terminate Eustace.  The trial court instructed the jury that Afor cause@ meant:

[A]n objective good
faith belief of the employer in accordance with a reasonable employer under
similar circumstances.  Your determination of this issue must focus on whether
Key=s decision to
terminate Joe Eustace was based upon an arbitrary, capricious or illegal
reason, or instead on facts which Key reasonably believed to be true at the
time the decision was made.

 








This instruction
is based upon Maryland law.  Key does not contend that it was given in error.
Consequently, we review the legal sufficiency of the evidence against this
instruction.[2]  Bradford
v. Vento, 48 S.W.3d 749, 754 (Tex. 2001).

1.  Controlling Law.

Key
directs our attention to Maryland caselaw for the proposition that cause is not
limited to the specific provisions of a contract but can include common law
grounds such as loss of faith and trust.  See, e.g., Towson Univ. v. Conte,
862 A.2d 941, 956 (Md. 2004).  Key argues also that Maryland law does not
permit the jury to review the factual basis for the employer=s decision but, instead, it
may only review the employer=s
objective motivation.  See id. at 950.

In
Towson, the court considered who determined whether an employer had just
cause:  the employer or jury?  The court held that the answer depended upon the
language of the employment contract.  Id. at 948.  Because their
contract was ambiguous on this point, the court determined that, as a matter of
common law, the jury=s
role was to review the employer=s
objective motivation and not to determine whether just cause actually existed. 
Id. at 950.  The trial court followed this principle.  During trial, the
court advised counsel:

Of course, the question the jury=s got to determine is whether or not Key had
an objective good faith belief to terminate him, not whether they actually had
just cause, but whether or not they had a reason to believe that B to reasonably believe that
there was a basis to terminate him, right?








Because the jury
was only asked to determine whether Key reasonably believed the facts upon
which it relied to be true B
not whether the facts were in fact true, we will not consider whether Key
proved that it had cause to terminate Eustace but whether it proved as a matter
of law that Eustace was terminated for cause and not for an Aarbitrary, capricious or
illegal reason.@ 
Because neither party contends that Maryland utilizes a heightened standard of
review for determining the sufficiency of the evidence, we will use Texas law
to make this determination.  Cf. Arkoma Basin Exploration Co. v. FMF
Assocs. 1990-A, Ltd., 249 S.W.3d 380, 383 (Tex. 2008) (applying Virginia
law and its requirement of clear and convincing evidence to establish liability
for fraud because this heightened standard is more substantive than
procedural).

In
considering a legal sufficiency challenge, we review all the evidence in the
light most favorable to the prevailing party and indulge every inference in
their favor.  City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex.
2005).  We must credit any favorable evidence if a reasonable factfinder could
and disregard any contrary evidence unless a reasonable factfinder could not.  Id.
at 821-22, 827.  We may sustain a legal sufficiency challenge only when (1) the
record discloses a complete absence of evidence of a vital fact, (2) the court
is barred by rules of law or evidence from giving weight to the only evidence
offered to prove a vital fact, (3) the only evidence offered to prove a vital
fact is no more than a mere scintilla, or (4) the evidence conclusively
establishes the opposite of a vital fact. Id. at 810.  

2.  The Evidence. 

Key
argues that it had cause to terminate Eustace because he was insubordinate,
because he failed to implement Key=s
asset tracking software, and because he failed to properly manage and supervise
his direct subordinates.  Key points to evidence that Eustace violated a
specific instruction not to discuss the decision to terminate Crisp; that
Eustace=s division
suffered several incidents of theft of major pieces of equipment; that, when
Key initiated an investigation of the South Texas Division, Eustace did not
cooperate but wanted the investigation stopped; that the investigation revealed
several basic security lapses; and that Eustace failed to properly supervise
Crisp and thus allowed him to defraud the company.








Eustace
disputes that Key had cause to terminate him and contends that Key=s reasons are pretextual
because he was really fired so that Alario could replace him with a hunting
buddy.[3] Eustace
points to evidence that he never received a reprimand or warning during his
five years of employment; that, in his last employment review dated April 22,
2003, his supervisors Jim Byerlotzer and Jim Flynt, both of whom were aware of
the South Texas Division investigation, described Eustace as a solid performer Aplus@ overall and did not grade his work as
deficient in any of the twenty measured categories; that, when Key received the
report from the investigation of its South Texas Division and decided that it
would terminate Crisp, Key=s
CEO refused to accept Eustace=s
resignation; that three days after Crisp=s
termination, Key=s
Board of Directors voted Eustace 40,000 shares of restricted stock; and that
Key continued to entrust Eustace with responsibility after the events it
claimed at trial constituted cause for his termination.

Key
was aware by December 15, 2003, that Eustace violated orders by telling
Williams that Crisp was being terminated.  Eustace, however, was not terminated
until April 20, 2004.  In the meantime, Key hired Alario as its COO in January
2004.  Almost immediately, Alario began recruiting Phil Coyne, a personal
friend and hunting buddy.  Alario testified that he hired Coyne because he
wanted a strong operations person to head the Southern Region.  Coyne had a
high school education.  He had no experience in fishing tools or trucking, and
at the time, he was supervising an explosives manufacturing facility.  Coyne
was the only person interviewed, he interviewed only with Alario, and he did
not complete an application for employment until one month after he had been
hired B even though
Key=s policies
required an application as a condition of employment.  After Coyne replaced
Eustace, the Southern Region=s
total revenue fell 30%, and its trucking revenue dropped 2.1 million per
month.  Coyne was not disciplined for this lost revenue.  In fact, when the
company reorganized into two operating groups, Coyne was promoted to head the
Eastern Region.

Eustace
also points to evidence that his termination allowed management to distribute
additional stock options.  The 1997 Incentive Plan limited the number of stock
options or restricted shares that could be issued to management without
shareholder approval.  Between 2004 and 2007, 91.4% to 95.6% of the available
options were issued.  Eustace=s
termination resulted in a forfeiture of his 140,000 options and, thus, made
them available for redistribution to others.  Alario was arguably a beneficiary
of this because he received 425,000 shares of restricted stock and 200,000
options between 2004 and 2006.  Finally, Eustace testified that the day after
his termination, Flynt asked to meet with him.  During that meeting, Flynt told
him, AI just want you
to know you got screwed.@

3.  Conclusion.  








When
the parties offer conflicting testimony, particularly on an issue such as
intent, the jury has the exclusive responsibility to determine the credibility
of the witnesses and the weight to be given their testimony.  Serv. Corp.
Int=l v. Aragon,
268 S.W.3d 112, 118 (Tex. App.CEastland
2008, pet. filed).  Each of the reasons proffered by Key for terminating
Eustace would constitute cause under the terms of his employment agreement or
Maryland common law, and there was evidence that each was true.  However, the
jury also had evidence that these reasons were pretextual.  While Key
vigorously disputed this at trial, we must assume that the jury resolved the
conflicting evidence of intent and motive in favor of Eustace.  City of
Keller, 168 S.W.3d at 822.  If so, there is legally sufficient evidence to
support its verdict, and the trial court did not err by rendering judgment
based upon it.  Issue one is overruled. 

B. 
Is Eustace=s
Stock Option Damage Claim Barred as a Matter of Law?

Key
argues that, even if Eustace was not terminated for cause, it had the right to
terminate him without cause and that, if it had done so, he would have been
unable to exercise his options before they expired because Key did not have an
effective registration statement on file with the SEC.  Because Eustace could
not exercise his options, Key argues that it was error to award him any damages
for lost options.  Eustace responds that Key has waived this argument and that
neither this provision nor federal securities law precludes the grantee=s attempt to exercise an
option.

1.  Waiver. 

After
the parties rested, the trial court released the jury to consider the charge. 
Key argued that Eustace=s
ability to exercise stock options was a matter for the trial court to decide,
and it tendered the deposition of its in-house counsel, Kimberly Frye, for that
purpose.  Eustace disputed that this was a legal rather than factual issue, and
he objected to Frye=s
deposition testimony as unreliable.  Key acknowledged that, if there was a jury
issue, it had waived that issue.  The trial court overruled Eustace=s objection to Frye=s deposition and admitted
her testimony.[4]  Key=s counsel then offered the
following stipulation:

If
it please the Court, prior to objecting to the Charge, I had indicated to
counsel in the Court that we would stipulate on the record that a failure of
compliance to the first question would assume that the jury had found causation
of damages.  We reserve the right, of course, to contend with the Court that
the Court could disregard that or consider causation of damages as a matter of
law.

 

Eustace=s attorney responded:

I
just need to make sure that we=re
all clear on the record that a finding of did not comply includes causation,
not only of the severance loss, but of the stock option loss that we=re claiming as well.








 

[KEY=S COUNSEL]:  That is
accurate.

 

[EUSTACE=S COUNSEL]:  Okay.  With
that, we agree. 

 

Eustace
characterizes Key=s
argument as an attempt to assert an impossibility defense and contends that
this stipulation precludes it.  We agree with Eustace that any issue that would
require a jury finding cannot be asserted now.  We do not agree, however, that
this stipulation waived Key=s
argument that Eustace=s
stock option damage claim was barred as a matter of law.  Counsel clearly
presented this issue to the trial court as a legal challenge prior to the start
of the charge conference, tendered evidence in support of its challenge, and
then reminded the court of its position prior to making any charge objection.  See
Tex. R. App. P. 33.1(a).

2.  Impossibility and Fault.  

The
more difficult question is exactly what issue is presented?  Key argues that
the failure to have an effective registration statement on file is
determinative as a matter of law because without one no stock transaction could
take place.  The parties have spilt much ink and, ever-increasingly, animus in
this court arguing over whether Key=s
argument is an attempt to raise an impossibility defense on appeal and over who
should be blamed for the need to restate prior financial statements. Because
impossibility of performance is an affirmative defense and because it was not
submitted to the jury, it is appropriate to first determine what that defense
encompasses so that it may be eliminated from our analysis.  

The
impossibility defense has been referred to by Texas courts as impossibility of
performance, commercial impracticability, and frustration of purpose.  Tractebel
Energy Mktg., Inc. v. E.I. Du Pont de Nemours & Co., 118 S.W.3d
60, 64 n.6 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied).  It is based upon Section 261 of the
Restatement (Second) of Contracts, which provides:








Where,
after a contract is made, a party=s
performance is made impracticable without his fault by the occurrence of an
event the non-occurrence of which was a basic assumption on which the contract
was made, his duty to render that performance is discharged, unless the language
or the circumstances indicate the contrary.[5]

 

The
impossibility defense generally applies in three instances:  (1) the death or
incapacity of a person necessary for performance, (2) the destruction or
deterioration of a thing necessary for performance, and (3) prevention by
governmental regulation.  Tractebel, 118 S.W.3d at 65.   The first two
instances are factually inapplicable.  The third allows courts to read into a
contract an escape clause that does not otherwise exist.  See id. at
66.  Because Key has disavowed this defense, any excuse for nonperformance must
be provided by, and is limited to, the terms of the agreement itself.

The
next question we must address is whether either parties= responsibility for the need to restate Key=s financial statements is
relevant to our construction of Eustace=s
employment agreement.  Key relies upon the following provision of the 1997
Incentive Plan to argue that Eustace=s
damage claim is barred as a matter of law:

The
exercise of any Incentive Award granted hereunder shall only be effective at
such time as counsel to the Company shall have determined that the issuance and
delivery of Shares of Common Stock pursuant to such exercise is in compliance
with all applicable laws, regulations of governmental authorities and the
requirements of any securities exchange on which Shares of Common Stock are
traded.  The Committee may, in its discretion, defer the effectiveness of any
exercise of an Incentive Award in order to allow the issuance of Shares of
Common Stock to be made pursuant to registration or an exemption from
registration or other methods for compliance available under federal or state
securities laws.  The Committee shall inform the Grantee (or the permitted
transferee of such Grantee) in writing of its decision to defer the
effectiveness of the exercise of an Incentive Award.  During the period that
the effectiveness of the exercise of an Incentive Award has been deferred, the
Grantee (or the permitted transferee of such Grantee) may, by written notice to
the Committee, withdraw such exercise and obtain the refund of any amount paid
with respect thereto.

 








This provision
contains no reference to fault, but Eustace argues that the plan required Key
to ensure that shares were available for issuance as awards and that, because
the restatement was necessitated by Key=s
actions, he can recover the value of his lost options.  Specifically, Eustace
points to Paragraph 1.5 of the agreement entitled AShares of Common Stock Available for Incentive
Awards@ and the
following sentence within that section:  AThe
Board and the appropriate officers of the Company shall from time to time take
whatever actions are necessary to file any required documents with governmental
authorities, stock exchanges and transaction reporting systems to ensure that
Shares are available for issuance pursuant to Incentive Awards.@  Eustace=s argument is persuasive
when this sentence is considered alone, but when read in connection with the
remainder of Paragraph 1.5, it loses some attraction.[6] 
Moreover, that construction cannot be reconciled with Paragraph 6.1(c), which
provides: AThe Company
shall be under no obligation to effect the registration pursuant to the Securities
Act of 1933, as amended (the >Securities
Act=), of any Shares
of Common Stock to be issued hereunder or to effect similar compliance under
any state laws.@  
Fault, therefore, is not material to our construction of the agreement.

Even
if we are mistaken or if the agreement otherwise imposed a duty upon Key and in
favor of Eustace to maintain an effective registration statement, we need not
consider fault because that issue was not tried below.  The jury was only asked
if Key breached Eustace=s
employment agreement by terminating him without cause.  We appreciate that
Hobbs testified that it was Key=s
responsibility to have an effective registration statement and that Key stated
in a Form 8-K that it was unable to maintain its statement because it had
failed to keep its books in accordance with generally accepted accounting
principles.  However, there was also considerable evidence that a significant
portion of these accounting problems were attributable to the incidents of
fraud in Eustace=s
region and under his watch. 








During
the charge conference and in response to Key=s
argument that Eustace=s
option claim was barred as a matter of law, Eustace argued that Key=s position necessitated an
impossibility issue and that Key was responsible for tendering one.  Key did
not do so and, as we have previously noted, may not rely upon this defense on
appeal.  That, however, is not synonymous with a jury finding of breach of
contract for failing to maintain a registration statement.  Nor is this finding
supplied by the stipulation because that dealt with causation and not
liability.  Because neither party requested a jury issue on fault, we cannot
assume that either party breached the employment agreement or waived any
contractual right because of the restatement process.  Consequently, the issue
presented by this case is whether the employment agreement, in light of the
undisputed evidence, defeated any damage claim for lost options as a matter of
law.

3.  The Lack of a Registration Statement.

Frye
testified that Key was required to file a Form 10-K annually but that it was
unable to file its 2003 10-K in March of 2004 because of the restatement
process.  This made its registration statement ineffective, and on April 8,
2004, Key announced that it was temporarily suspending the exercise of options
for its common stock.  Frye testified that there was no exemption available for
optionees to exercise their options, that no one was allowed to exercise any
options during the restatement process, and that options for a total of
1,895,995 shares were canceled, expired, or terminated.








Eustace
does not dispute the need for a registration statement but counters that he could
have  exercised his options after his termination[7]
and that Key could have deferred delivering them until the restatement process
was completed and a new registration statement was filed.  The 1997 Incentive
Plan gave Key the sole discretion to defer the effectiveness of an exercise of
an Incentive Award.  Thus, Key could have given Eustace additional time to
exercise his options, but it was not obligated to do so.  Also, there is no
indication in our record that it did so for any other employee.         Eustace=s argument also runs
counter to federal securities law.  Federal law, both through statute and SEC
regulation, governs securities transactions.  Transactions involving
unregistered securities are generally prohibited.  15 U.S.C. ' 77e provides in part:

(a)
Sale or delivery after sale of unregistered securities

 

Unless
a registration statement is in effect as to a security, it shall be unlawful
for any person, directly or indirectlyB

 

(1)
to make use of any means or instruments of transportation or communication in
interstate commerce or of the mails to sell such security through the use or
medium of any prospectus or otherwise; or

 

(2)
to carry or cause to be carried through the mails or in interstate commerce, by
any means or instruments of transportation, any such security for the purpose
of sale or for delivery after sale.

 

(c)
Necessity of filing registration statement

 

It
shall be unlawful for any person, directly or indirectly, to make use of any
means or instruments of transportation or communication in interstate commerce
or of the mails to offer to sell or offer to buy through the use or medium of
any prospectus or otherwise any security, unless a registration statement has
been filed as to such security, or while the registration statement is the
subject of a refusal order or stop order or (prior to the effective date of the
registration statement) any public proceeding or examination under section 77h
of this title.

 

There are
exemptions to this requirement, such as for private placements,[8]
but Eustace does not contend that any exemption applied.  








The
exercise of an option B
regardless of whether a security is actually delivered B is a regulated transaction that Key could not
lawfully participate in without an effective registration statement.  Federal
law is clear that an option to purchase stock is a derivative security and that
the exercise of a stock option is the sale of a covered security.  See West
v. Innotrac Corp., 463 F.Supp.2d 1169, 1180 (D. Nev. 2006) (noting that the
1933 Act defines Aoptions@ as a security and Asale@ as every contract of sale or disposition of a
security or interest in a security for value); see also 17 C.F.R. ' 240.16a-1(c) (AThe term derivative
security shall mean any option . . . with an exercise or conversion privilege
at a price related to an equity security.@). 
The Supreme Court has recognized that the Astatutory
definitions of >purchase= and >sale= are broad and, at least
arguably, reach many transactions not ordinarily deemed a sale or purchase.@  Kern County Land Co.
v. Occidental Petroleum Corp., 411 U.S. 582, 593-94 (1973).  For example,
the grant of an employee stock option on a covered security is a sale of that
security.   Innotrac Corp., 463 F.Supp.2d at 1175 n.6.  In fact, the SEC
adopted specific rules to ensure that employees exercising stock options were
not liable for short-swing profits under 15 U.S.C. ' 78p(b).  See 17 C.F.R. ' 240.16b-6(a), (b) (A[T]he acquisition of
underlying securities at a fixed exercise price due to the exercise@ of the option Ashall be exempt from the
operation of section 16(b) of the Act.@).[9]

The
Third Circuit rejected an argument similar to Eustace=s contention that a registration statement was
unnecessary so long as Key deferred delivery of his stock certificates.  See
In re: Cendant Corp. Securities Litigation, 181 Fed.Appx. 206, 2006 WL
1342808 (3rd Cir. 2006).  In this case, an employee had the right to buy
company stock at a fixed price.  Prior to her execution of this right, the
company discovered problems with its accounting practices, retracted financial
statements from the SEC, and imposed a blackout on the exercise of stock
options.  Id. at 208.  The employee was subsequently allowed to exercise
her options, but she earned substantially less than she would have if she had
been allowed to acquire and sell stock during the blackout.  Id.  The
employee sued, contending that the company could not bar her from exercising
her option but could only postpone issuing stock certificates.  The court found
this contention without merit and held that the employee=s position would have required the employer to
violate federal law.  Id. at 209.








Eustace
relies upon Walden v. Affiliated Computer Servs., 97 S.W.3d 303 (Tex.
App.CHouston [14th
Dist.] 2003, pet. denied), for the proposition that the lack of a registration
statement did not bar him from exercising his options.  In that case,
Affiliated Computer Services, or ACS, granted stock options to senior managers
and key employees of two related savings and loan associations.  The
associations were declared insolvent and, as part of subsequent litigation
between them and ACS, the Office of Thrift Supervision issued a Cease and
Desist Order that prohibited ACS from issuing any stock to the option holders
unless required by court order.  Id. at 311.  Several option holders
attempted to exercise their options before they expired, but while the Cease
and Desist Order was still effective.  Id. at 327.  ACS argued that the
Order prevented the option holders from legally exercising their options and,
because it was not terminated until after the options had expired, that the
individuals no longer had any rights under those options.  Id.  The
Houston Court disagreed because it found that the Cease and Desist Order
prohibited action by ACS but not the individuals and, therefore, that the
individuals had timely exercised their options.  

Walden
differs from this case in two important respects.  First, ACS=s position was predicated
upon the impossibility of performance defense.  That defense is not asserted in
this case.  Consequently, we are not concerned with any subsequent governmental
action but merely the language of Eustace=s
contract.  Second, the scope of the restrictions imposed upon ACS is materially
different from the provisions of Eustace=s
agreement.  In Walden, ACS B
but not the option holders B
was subject to a specific prohibition:  A[ACS]
shall henceforth not issue any stock or make any payments to [the option
holders].@  See id.
at 311.  There is no indication in the opinion that ACS securities
transactions were otherwise restricted.  Key relies upon federal law to argue
that it could not participate in any nonexempt securities transaction including
the exercise of an option.








We
agree with the Third Circuit=s
analysis.  Besides being a derivative security, the options gave Eustace
contractual rights and imposed contingent obligations upon Key.  Eustace=s claim is necessarily
predicated upon the conversion of his derivative securities or contractual
rights into a beneficial ownership interest in a covered security.  If the loss
of those options entitles him to the difference between Key=s stock price and his
strike price, then, as soon as Key received Eustace=s notice and payment, he was entitled to
receive and Key was obligated to furnish stock certificates.  Regardless of
when the actual transfer of stock certificates transpired, this conversion of
contractual rights into a definitive obligation is a sale.  See Falkowski v.
Imation Corp., 309 F.3d 1123, 1129 (9th Cir. 2002) (Aif a person contracts to sell a security, that
contract is a >sale= even if the sale is never
consummated@). 
Because any stock option exercise would be a prohibited securities transaction,
Key is correct that any damage claim for lost options is barred as a matter of
law.  Key=s second
issue is sustained.  This holding makes it unnecessary to address Eustace=s cross-appeal challenging
the trial court=s
calculation of lost option damages.

C. 
Eustace=s
Motion for Sanctions.  

Eustace
filed a motion for sanctions in this court contending that statements in Key=s briefs were misleading. 
Eustace=s motion was
predicated upon a document that was produced by Key in a separate lawsuit, was
accompanied by documents that are outside our record, and relies upon the
premise that Key wrongfully failed to produce material in response to discovery
in this suit.  We have previously indicated to counsel that we cannot rule upon
this motion because it involves matters beyond our record and because it would
require fact finding.  We are, therefore, remanding Eustace=s motion to the trial court
to determine whether sanctions are appropriate and, if so, to determine the
appropriate sanction.

                                                        IV. 
Holding 

 
The judgment of the trial court is affirmed in part and reversed and rendered
in part.  That portion of the trial court=s
judgment awarding Eustace breach of contract damages, including attorney=s fees for trial and the
conditional award for attorney=s
fees on appeal, is affirmed.  That portion of the judgment awarding Eustace
lost options damages is reversed, and judgment is rendered that he take
nothing.  Eustace=s
motion for sanctions is remanded to the trial court for resolution.

 

 

RICK STRANGE

JUSTICE

 

April 30, 2009

Panel consists of:  Wright, C.J.,


McCall, J., and Strange, J.









     [1]See Kaltman v.
Key Energy Servs., Inc., 447 F.Supp.2d 648, 653 (W.D. Tex. 2006).





     [2]Eustace=s employment agreement and the Incentive Option
Agreement contain similar, but not identical, definitions of cause.  In light
of the trial court=s submission and the absence of any issue challenging
this charge, it is unnecessary for us to address either definition.  For this
same reason, it is also unnecessary to address Key=s contention that Eustace=s
severance pay claim is governed by Texas law.





     [3]In light of the
jury=s instruction, we are not summarizing the evidence that
Eustace relies upon to argue that Key had no cause to terminate him but are
focusing on the evidence of Key=s motivation to
terminate him.





     [4]Eustace does not
challenge the propriety of this decision.  We have, therefore, examined Frye=s testimony.





     [5]Restatement (Second) of Contracts ' 261 (1981).





     [6]Paragraph 1.5
provides:

 

Subject to adjustment under Section 6.5, there shall be
available for Incentive Awards under this Plan granted wholly or partly in
Common Stock (including rights or Options that may be exercised for or settled
in Common Stock) an aggregate of the greater of (a) 3,000,000 shares of Common
Stock and (b) 10% of the number of Shares of Common Stock issued and outstanding
on the last day of each calendar quarter; provided, however, that a decrease in
the number of issued and outstanding Shares from the previous calendar quarter
shall not result in a decrease in Common Stock available for Incentive Awards
under this Plan.  All 3,000,000 Shares of Common Stock initially available for
Incentive Awards under this Plan shall be available for Incentive Stock
Options.

 

The number of Shares of Common Stock that are the subject of Incentive
Awards under this Plan, that are forfeited or terminated, expire unexercised,
are settled in cash in lieu of Common Stock or in a manner such that all or
some of the Shares covered by an Incentive Award are not issued to a Grantee or
are exchanged for Incentive Awards that do not involve Common Stock, shall
again immediately become available for Incentive Awards hereunder.  The
Committee may from time to time adopt and observe such procedures concerning
the counting of Shares against the Plan maximum as it may deem appropriate. 
The Board and the appropriate officers of the Company shall from time to time
take whatever actions are necessary to file any required documents with
governmental authorities, stock exchanges and transaction reporting systems to
ensure that Shares are available for issuance pursuant to Incentive Awards.





     [7]The 1997 Incentive
Plan required Eustace to give written notice of his intent to exercise an
option and, unless Key agreed in advance to do otherwise, to pay in full for
all shares acquired at the time of his notice.  Because of the parties= stipulation during the charge conference, we assume
that he performed all conditions precedent to the exercise of his options or
that he was excused from doing so.





     [8]See, e.g., Doran
v. Petroleum Mgmt. Corp., 545 F.2d 893 (5th Cir. 1977) (discussing the
applicability of the private placement exemption for a sophisticated investor
who purchased a limited partnership interest in an oil drilling venture).





     [9]Prior to the
adoption of these rules, the sale of stock by an officer or director within a
six-month period before or after the date of the exercise of a stock option
could result in short-swing profit liability.  See, e.g., Freedman v. Barrow,
427 F.Supp. 1129, 1149 (S.D. N.Y. 1976).