**Opinion filed April 30, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-07-00314-CV

_____

## KEY ENERGY SERVICES, INC., Appellant/Cross-Appellee,

## V.

## JOSEPH B. EUSTACE, Appellee/Cross-Appellant

**On Appeal from the 238th District Court**

**Midland County, Texas**

**Trial Court Cause No. CV45415**

## O P I N I O N

This is an employment dispute. Key Energy Services, Inc. terminated Joseph B. Eustace and he sued, alleging contract, securities, and tort causes of action. The trial court granted summary judgment for Key on Eustace's securities fraud claim and, at trial, directed a verdict against him on his tort claims. The jury found for Eustace on his contract claim, and he was awarded $724,500 for lost stock options, $180,000 for lost severance payments, and attorney's fees of $295,000. We affirm in part and reverse and render in part.

I. *Background Facts*

In 1999, Key employed Eustace to serve as its Group Vice President – Gulf Coast Region. Eustace participated in an incentive compensation program known as Key's 1997 Incentive Plan, and he received a number of stock options. In 2001, the parties signed a three-year employment agreement effective September 4, 2001. The agreement contained a termination provision. If Eustace terminated his employment, if Key elected not to extend his contract, or if Key terminated him for cause, he was entitled to minimal benefits. If, however, Key otherwise terminated his employment, Eustace was entitled to his annual base salary as severance compensation.

Eustace's area of responsibility included the South Texas Division. John Crisp was the South Texas Division manager. Following an internal audit in September and October 2003, Key decided to perform a full-scale investigation of the South Texas Division. Initially, Key was concerned about reports of missing swab units. However, the investigation revealed that much more equipment was missing, that Crisp was forming competing companies, and that he was converting Key's equipment for their benefit. In December, Key decided to terminate Crisp. Eustace offered to resign in light of the investigation, but Key's CEO, Fran John, declined the offer and instructed him to fix the situation. That same month, Key's Board of Directors voted Eustace 40,000 shares of restricted stock.

Key had recently acquired Cactus Trucking, a business located within the South Texas Division. The day before Crisp was terminated, Eustace met with Cactus's former owner, Todd Williams. He was working for Key as a consultant, and Eustace wanted to discuss retaining Cactus's customers. Eustace had been instructed to keep Crisp's impending termination quiet, but during their meeting, he told Williams that Key would terminate Crisp the next day. Williams alerted Crisp who then deleted several files from his computer.

Key was unable to file its 10-K in March 2004 because it knew that prior year financial statements were inaccurate and required restatement. On March 29, 2004, Key issued a press release announcing a write-down of approximately $78 million of assets.[1] On April 8, Key temporarily

---

[1]*See Kaltman v. Key Energy Servs., Inc.*, 447 F.Supp.2d 648, 653 (W.D. Tex. 2006).

suspended the exercise of options for its common stock pending completion of the restatement process.

Key decided to terminate Eustace. Richard James Alario, who was hired as Key's COO in January 2004 and who, at the time of trial, was Key's Chairman of the Board and CEO, asked Lonnie Hobbs, Key's Associate General Counsel, to determine if the termination would be with or without cause. Hobbs was involved in the initial investigation of missing assets and the 2003 internal audit, and he participated in the investigation and litigation following the discovery that Crisp deleted several computer files prior to his termination. Hobbs reviewed Eustace's employment agreement and determined that cause existed. On April 20, 2004, Eustace was terminated. He was given a letter stating that he was being terminated for cause and that his stock options were canceled, but without specifying the grounds for his termination. At the time, Eustace had 140,000 vested options.

## II. *Issues*

Key challenges the judgment with two issues. Key argues first that it has no liability to Eustace because, as a matter of law, it had cause to terminate him. Alternatively, Key argues that Eustace's stock option claim is barred because, even if he was not terminated for cause, his stock options otherwise expired before they could have been exercised. Eustace has filed a cross-appeal. Eustace contends that the trial court erred by valuing his stock options as of the date of his termination rather than on the date the restriction on trading Key's stock was lifted.

## III. *Analysis*

### A. Did Key, as a Matter of Law, Terminate Eustace for Cause?

The jury found that Key failed to comply with Eustace's employment and stock option agreements. Key argues initially that the trial court erred by rendering judgment on the verdict because, as a matter of law, it had cause to terminate Eustace. The trial court instructed the jury that "for cause" meant:

> [A]n objective good faith belief of the employer in accordance with a reasonable employer under similar circumstances. Your determination of this issue must focus on whether Key's decision to terminate Joe Eustace was based upon an arbitrary, capricious or illegal reason, or instead on facts which Key reasonably believed to be true at the time the decision was made.

3

This instruction is based upon Maryland law. Key does not contend that it was given in error. Consequently, we review the legal sufficiency of the evidence against this instruction.[2] *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001).

### 1. Controlling Law.

Key directs our attention to Maryland caselaw for the proposition that cause is not limited to the specific provisions of a contract but can include common law grounds such as loss of faith and trust. *See, e.g., Towson Univ. v. Conte*, 862 A.2d 941, 956 (Md. 2004). Key argues also that Maryland law does not permit the jury to review the factual basis for the employer's decision but, instead, it may only review the employer's objective motivation. *See id.* at 950.

In *Towson*, the court considered who determined whether an employer had just cause: the employer or jury? The court held that the answer depended upon the language of the employment contract. *Id.* at 948. Because their contract was ambiguous on this point, the court determined that, as a matter of common law, the jury's role was to review the employer's objective motivation and not to determine whether just cause actually existed. *Id.* at 950. The trial court followed this principle. During trial, the court advised counsel:

> Of course, the question the jury's got to determine is whether or not Key had an objective good faith belief to terminate him, not whether they actually had just cause, but whether or not they had a reason to believe that – to reasonably believe that there was a basis to terminate him, right?

Because the jury was only asked to determine whether Key reasonably believed the facts upon which it relied to be true – not whether the facts were in fact true, we will not consider whether Key proved that it had cause to terminate Eustace but whether it proved as a matter of law that Eustace was terminated for cause and not for an "arbitrary, capricious or illegal reason." Because neither party contends that Maryland utilizes a heightened standard of review for determining the sufficiency of the evidence, we will use Texas law to make this determination. *Cf. Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 383 (Tex. 2008) (applying Virginia law and its

---

[2]Eustace's employment agreement and the Incentive Option Agreement contain similar, but not identical, definitions of cause. In light of the trial court's submission and the absence of any issue challenging this charge, it is unnecessary for us to address either definition. For this same reason, it is also unnecessary to address Key's contention that Eustace's severance pay claim is governed by Texas law.

requirement of clear and convincing evidence to establish liability for fraud because this heightened standard is more substantive than procedural).

In considering a legal sufficiency challenge, we review all the evidence in the light most favorable to the prevailing party and indulge every inference in their favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit any favorable evidence if a reasonable factfinder could and disregard any contrary evidence unless a reasonable factfinder could not. *Id.* at 821-22, 827. We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810.

### 2. The Evidence.

Key argues that it had cause to terminate Eustace because he was insubordinate, because he failed to implement Key's asset tracking software, and because he failed to properly manage and supervise his direct subordinates. Key points to evidence that Eustace violated a specific instruction not to discuss the decision to terminate Crisp; that Eustace's division suffered several incidents of theft of major pieces of equipment; that, when Key initiated an investigation of the South Texas Division, Eustace did not cooperate but wanted the investigation stopped; that the investigation revealed several basic security lapses; and that Eustace failed to properly supervise Crisp and thus allowed him to defraud the company.

Eustace disputes that Key had cause to terminate him and contends that Key's reasons are pretextual because he was really fired so that Alario could replace him with a hunting buddy.[3] Eustace points to evidence that he never received a reprimand or warning during his five years of employment; that, in his last employment review dated April 22, 2003, his supervisors Jim Byerlotzer and Jim Flynt, both of whom were aware of the South Texas Division investigation, described Eustace as a solid performer "plus" overall and did not grade his work as deficient in any of the twenty measured categories; that, when Key received the report from the investigation of its

---

[3]In light of the jury's instruction, we are not summarizing the evidence that Eustace relies upon to argue that Key had no cause to terminate him but are focusing on the evidence of Key's motivation to terminate him.

South Texas Division and decided that it would terminate Crisp, Key's CEO refused to accept Eustace's resignation; that three days after Crisp's termination, Key's Board of Directors voted Eustace 40,000 shares of restricted stock; and that Key continued to entrust Eustace with responsibility after the events it claimed at trial constituted cause for his termination.

Key was aware by December 15, 2003, that Eustace violated orders by telling Williams that Crisp was being terminated. Eustace, however, was not terminated until April 20, 2004. In the meantime, Key hired Alario as its COO in January 2004. Almost immediately, Alario began recruiting Phil Coyne, a personal friend and hunting buddy. Alario testified that he hired Coyne because he wanted a strong operations person to head the Southern Region. Coyne had a high school education. He had no experience in fishing tools or trucking, and at the time, he was supervising an explosives manufacturing facility. Coyne was the only person interviewed, he interviewed only with Alario, and he did not complete an application for employment until one month after he had been hired – even though Key's policies required an application as a condition of employment. After Coyne replaced Eustace, the Southern Region's total revenue fell 30%, and its trucking revenue dropped 2.1 million per month. Coyne was not disciplined for this lost revenue. In fact, when the company reorganized into two operating groups, Coyne was promoted to head the Eastern Region.

Eustace also points to evidence that his termination allowed management to distribute additional stock options. The 1997 Incentive Plan limited the number of stock options or restricted shares that could be issued to management without shareholder approval. Between 2004 and 2007, 91.4% to 95.6% of the available options were issued. Eustace's termination resulted in a forfeiture of his 140,000 options and, thus, made them available for redistribution to others. Alario was arguably a beneficiary of this because he received 425,000 shares of restricted stock and 200,000 options between 2004 and 2006. Finally, Eustace testified that the day after his termination, Flynt asked to meet with him. During that meeting, Flynt told him, "I just want you to know you got screwed."

### 3. Conclusion.

When the parties offer conflicting testimony, particularly on an issue such as intent, the jury has the exclusive responsibility to determine the credibility of the witnesses and the weight to be given their testimony. *Serv. Corp. Int'l v. Aragon*, 268 S.W.3d 112, 118 (Tex. App.—Eastland 2008,

pet. filed). Each of the reasons proffered by Key for terminating Eustace would constitute cause under the terms of his employment agreement or Maryland common law, and there was evidence that each was true. However, the jury also had evidence that these reasons were pretextual. While Key vigorously disputed this at trial, we must assume that the jury resolved the conflicting evidence of intent and motive in favor of Eustace. *City of Keller*, 168 S.W.3d at 822. If so, there is legally sufficient evidence to support its verdict, and the trial court did not err by rendering judgment based upon it. Issue one is overruled.

### B. Is Eustace's Stock Option Damage Claim Barred as a Matter of Law?

Key argues that, even if Eustace was not terminated for cause, it had the right to terminate him without cause and that, if it had done so, he would have been unable to exercise his options before they expired because Key did not have an effective registration statement on file with the SEC. Because Eustace could not exercise his options, Key argues that it was error to award him any damages for lost options. Eustace responds that Key has waived this argument and that neither this provision nor federal securities law precludes the grantee's attempt to exercise an option.

#### 1. Waiver.

After the parties rested, the trial court released the jury to consider the charge. Key argued that Eustace's ability to exercise stock options was a matter for the trial court to decide, and it tendered the deposition of its in-house counsel, Kimberly Frye, for that purpose. Eustace disputed that this was a legal rather than factual issue, and he objected to Frye's deposition testimony as unreliable. Key acknowledged that, if there was a jury issue, it had waived that issue. The trial court overruled Eustace's objection to Frye's deposition and admitted her testimony.[4] Key's counsel then offered the following stipulation:

> If it please the Court, prior to objecting to the Charge, I had indicated to counsel in the Court that we would stipulate on the record that a failure of compliance to the first question would assume that the jury had found causation of damages. We reserve the right, of course, to contend with the Court that the Court could disregard that or consider causation of damages as a matter of law.

Eustace's attorney responded:

> I just need to make sure that we're all clear on the record that a finding of did not comply includes causation, not only of the severance loss, but of the stock option loss that we're claiming as well.

---

[4]Eustace does not challenge the propriety of this decision. We have, therefore, examined Frye's testimony.

7

[KEY'S COUNSEL]:  That is accurate.

[EUSTACE'S COUNSEL]:  Okay.  With that, we agree.

Eustace characterizes Key's argument as an attempt to assert an impossibility defense and contends that this stipulation precludes it.  We agree with Eustace that any issue that would require a jury finding cannot be asserted now.  We do not agree, however, that this stipulation waived Key's argument that Eustace's stock option damage claim was barred as a matter of law.  Counsel clearly presented this issue to the trial court as a legal challenge prior to the start of the charge conference, tendered evidence in support of its challenge, and then reminded the court of its position prior to making any charge objection.  *See* TEX. R. APP. P. 33.1(a).

### 2. Impossibility and Fault.

The more difficult question is exactly what issue is presented?  Key argues that the failure to have an effective registration statement on file is determinative as a matter of law because without one no stock transaction could take place.  The parties have spilt much ink and, ever-increasingly, animus in this court arguing over whether Key's argument is an attempt to raise an impossibility defense on appeal and over who should be blamed for the need to restate prior financial statements.  Because impossibility of performance is an affirmative defense and because it was not submitted to the jury, it is appropriate to first determine what that defense encompasses so that it may be eliminated from our analysis.

The impossibility defense has been referred to by Texas courts as impossibility of performance, commercial impracticability, and frustration of purpose.  *Tractebel Energy Mktg., Inc. v. E.I. Du Pont de Nemours & Co.*, 118 S.W.3d 60, 64 n.6 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  It is based upon Section 261 of the Restatement (Second) of Contracts, which provides:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that

8

performance is discharged, unless the language or the circumstances indicate the contrary.[5]

The impossibility defense generally applies in three instances: (1) the death or incapacity of a person necessary for performance, (2) the destruction or deterioration of a thing necessary for performance, and (3) prevention by governmental regulation. *Tractebel*, 118 S.W.3d at 65. The first two instances are factually inapplicable. The third allows courts to read into a contract an escape clause that does not otherwise exist. *See id.* at 66. Because Key has disavowed this defense, any excuse for nonperformance must be provided by, and is limited to, the terms of the agreement itself.

The next question we must address is whether either parties' responsibility for the need to restate Key's financial statements is relevant to our construction of Eustace's employment agreement. Key relies upon the following provision of the 1997 Incentive Plan to argue that Eustace's damage claim is barred as a matter of law:

> The exercise of any Incentive Award granted hereunder shall only be effective at such time as counsel to the Company shall have determined that the issuance and delivery of Shares of Common Stock pursuant to such exercise is in compliance with all applicable laws, regulations of governmental authorities and the requirements of any securities exchange on which Shares of Common Stock are traded. The Committee may, in its discretion, defer the effectiveness of any exercise of an Incentive Award in order to allow the issuance of Shares of Common Stock to be made pursuant to registration or an exemption from registration or other methods for compliance available under federal or state securities laws. The Committee shall inform the Grantee (or the permitted transferee of such Grantee) in writing of its decision to defer the effectiveness of the exercise of an Incentive Award. During the period that the effectiveness of the exercise of an Incentive Award has been deferred, the Grantee (or the permitted transferee of such Grantee) may, by written notice to the Committee, withdraw such exercise and obtain the refund of any amount paid with respect thereto.

This provision contains no reference to fault, but Eustace argues that the plan required Key to ensure that shares were available for issuance as awards and that, because the restatement was necessitated by Key's actions, he can recover the value of his lost options. Specifically, Eustace points to Paragraph 1.5 of the agreement entitled "Shares of Common Stock Available for Incentive Awards" and the following sentence within that section: "The Board and the appropriate officers of the

---

[5]RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981).

Company shall from time to time take whatever actions are necessary to file any required documents with governmental authorities, stock exchanges and transaction reporting systems to ensure that Shares are available for issuance pursuant to Incentive Awards." Eustace's argument is persuasive when this sentence is considered alone, but when read in connection with the remainder of Paragraph 1.5, it loses some attraction.[6] Moreover, that construction cannot be reconciled with Paragraph 6.1(c), which provides: "The Company shall be under no obligation to effect the registration pursuant to the Securities Act of 1933, as amended (the 'Securities Act'), of any Shares of Common Stock to be issued hereunder or to effect similar compliance under any state laws." Fault, therefore, is not material to our construction of the agreement.

Even if we are mistaken or if the agreement otherwise imposed a duty upon Key and in favor of Eustace to maintain an effective registration statement, we need not consider fault because that issue was not tried below. The jury was only asked if Key breached Eustace's employment agreement by terminating him without cause. We appreciate that Hobbs testified that it was Key's responsibility to have an effective registration statement and that Key stated in a Form 8-K that it was unable to maintain its statement because it had failed to keep its books in accordance with generally accepted accounting principles. However, there was also considerable evidence that a significant portion of these accounting problems were attributable to the incidents of fraud in Eustace's region and under his watch.

---

[6]Paragraph 1.5 provides:

> Subject to adjustment under Section 6.5, there shall be available for Incentive Awards under this Plan granted wholly or partly in Common Stock (including rights or Options that may be exercised for or settled in Common Stock) an aggregate of the greater of (a) 3,000,000 shares of Common Stock and (b) 10% of the number of Shares of Common Stock issued and outstanding on the last day of each calendar quarter; provided, however, that a decrease in the number of issued and outstanding Shares from the previous calendar quarter shall not result in a decrease in Common Stock available for Incentive Awards under this Plan. All 3,000,000 Shares of Common Stock initially available for Incentive Awards under this Plan shall be available for Incentive Stock Options.

> The number of Shares of Common Stock that are the subject of Incentive Awards under this Plan, that are forfeited or terminated, expire unexercised, are settled in cash in lieu of Common Stock or in a manner such that all or some of the Shares covered by an Incentive Award are not issued to a Grantee or are exchanged for Incentive Awards that do not involve Common Stock, shall again immediately become available for Incentive Awards hereunder. The Committee may from time to time adopt and observe such procedures concerning the counting of Shares against the Plan maximum as it may deem appropriate. The Board and the appropriate officers of the Company shall from time to time take whatever actions are necessary to file any required documents with governmental authorities, stock exchanges and transaction reporting systems to ensure that Shares are available for issuance pursuant to Incentive Awards.

During the charge conference and in response to Key's argument that Eustace's option claim was barred as a matter of law, Eustace argued that Key's position necessitated an impossibility issue and that Key was responsible for tendering one. Key did not do so and, as we have previously noted, may not rely upon this defense on appeal. That, however, is not synonymous with a jury finding of breach of contract for failing to maintain a registration statement. Nor is this finding supplied by the stipulation because that dealt with causation and not liability. Because neither party requested a jury issue on fault, we cannot assume that either party breached the employment agreement or waived any contractual right because of the restatement process. Consequently, the issue presented by this case is whether the employment agreement, in light of the undisputed evidence, defeated any damage claim for lost options as a matter of law.

### 3. The Lack of a Registration Statement.

Frye testified that Key was required to file a Form 10-K annually but that it was unable to file its 2003 10-K in March of 2004 because of the restatement process. This made its registration statement ineffective, and on April 8, 2004, Key announced that it was temporarily suspending the exercise of options for its common stock. Frye testified that there was no exemption available for optionees to exercise their options, that no one was allowed to exercise any options during the restatement process, and that options for a total of 1,895,995 shares were canceled, expired, or terminated.

Eustace does not dispute the need for a registration statement but counters that he could have exercised his options after his termination[7] and that Key could have deferred delivering them until the restatement process was completed and a new registration statement was filed. The 1997 Incentive Plan gave Key the sole discretion to defer the effectiveness of an exercise of an Incentive Award. Thus, Key could have given Eustace additional time to exercise his options, but it was not obligated to do so. Also, there is no indication in our record that it did so for any other employee.

---

[7]The 1997 Incentive Plan required Eustace to give written notice of his intent to exercise an option and, unless Key agreed in advance to do otherwise, to pay in full for all shares acquired at the time of his notice. Because of the parties' stipulation during the charge conference, we assume that he performed all conditions precedent to the exercise of his options or that he was excused from doing so.

Eustace's argument also runs counter to federal securities law.  Federal law, both through statute and SEC regulation, governs securities *transactions*.  Transactions involving unregistered securities are generally prohibited.  15 U.S.C. § 77e provides in part:

(a) Sale or delivery after sale of unregistered securities

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly–

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

(c) Necessity of filing registration statement

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

There are exemptions to this requirement, such as for private placements,[8] but Eustace does not contend that any exemption applied.

The exercise of an option – regardless of whether a security is actually delivered – is a regulated transaction that Key could not lawfully participate in without an effective registration statement.  Federal law is clear that an option to purchase stock is a derivative security and that the exercise of a stock option is the sale of a covered security.  *See West v. Innotrac Corp.*, 463

---

[8]*See, e.g., Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893 (5th Cir. 1977) (discussing the applicability of the private placement exemption for a sophisticated investor who purchased a limited partnership interest in an oil drilling venture).

F.Supp.2d 1169, 1180 (D. Nev. 2006) (noting that the 1933 Act defines "options" as a security and "sale" as every contract of sale or disposition of a security or interest in a security for value); *see also* 17 C.F.R. § 240.16a-1(c) ("The term derivative security shall mean any option . . . with an exercise or conversion privilege at a price related to an equity security."). The Supreme Court has recognized that the "statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593-94 (1973). For example, the grant of an employee stock option on a covered security is a sale of that security. *Innotrac Corp.*, 463 F.Supp.2d at 1175 n.6. In fact, the SEC adopted specific rules to ensure that employees exercising stock options were not liable for short-swing profits under 15 U.S.C. § 78p(b). *See* 17 C.F.R. § 240.16b-6(a), (b) ("[T]he acquisition of underlying securities at a fixed exercise price due to the exercise" of the option "shall be exempt from the operation of section 16(b) of the Act.").[9]

The Third Circuit rejected an argument similar to Eustace's contention that a registration statement was unnecessary so long as Key deferred delivery of his stock certificates. *See In re: Cendant Corp. Securities Litigation*, 181 Fed.Appx. 206, 2006 WL 1342808 (3rd Cir. 2006). In this case, an employee had the right to buy company stock at a fixed price. Prior to her execution of this right, the company discovered problems with its accounting practices, retracted financial statements from the SEC, and imposed a blackout on the exercise of stock options. *Id.* at 208. The employee was subsequently allowed to exercise her options, but she earned substantially less than she would have if she had been allowed to acquire and sell stock during the blackout. *Id.* The employee sued, contending that the company could not bar her from exercising her option but could only postpone issuing stock certificates. The court found this contention without merit and held that the employee's position would have required the employer to violate federal law. *Id.* at 209.

Eustace relies upon *Walden v. Affiliated Computer Servs.*, 97 S.W.3d 303 (Tex. App.—Houston [14th Dist.] 2003, pet. denied), for the proposition that the lack of a registration

---

[9]Prior to the adoption of these rules, the sale of stock by an officer or director within a six-month period before or after the date of the exercise of a stock option could result in short-swing profit liability. *See, e.g., Freedman v. Barrow*, 427 F.Supp. 1129, 1149 (S.D. N.Y. 1976).

statement did not bar him from exercising his options. In that case, Affiliated Computer Services, or ACS, granted stock options to senior managers and key employees of two related savings and loan associations. The associations were declared insolvent and, as part of subsequent litigation between them and ACS, the Office of Thrift Supervision issued a Cease and Desist Order that prohibited ACS from issuing any stock to the option holders unless required by court order. *Id.* at 311. Several option holders attempted to exercise their options before they expired, but while the Cease and Desist Order was still effective. *Id.* at 327. ACS argued that the Order prevented the option holders from legally exercising their options and, because it was not terminated until after the options had expired, that the individuals no longer had any rights under those options. *Id.* The Houston Court disagreed because it found that the Cease and Desist Order prohibited action by ACS but not the individuals and, therefore, that the individuals had timely exercised their options.

*Walden* differs from this case in two important respects. First, ACS's position was predicated upon the impossibility of performance defense. That defense is not asserted in this case. Consequently, we are not concerned with any subsequent governmental action but merely the language of Eustace's contract. Second, the scope of the restrictions imposed upon ACS is materially different from the provisions of Eustace's agreement. In *Walden*, ACS – but not the option holders – was subject to a specific prohibition: "[ACS] shall henceforth not issue any stock or make any payments to [the option holders]." *See id.* at 311. There is no indication in the opinion that ACS securities transactions were otherwise restricted. Key relies upon federal law to argue that it could not participate in any nonexempt securities transaction including the exercise of an option.

We agree with the Third Circuit's analysis. Besides being a derivative security, the options gave Eustace contractual rights and imposed contingent obligations upon Key. Eustace's claim is necessarily predicated upon the conversion of his derivative securities or contractual rights into a beneficial ownership interest in a covered security. If the loss of those options entitles him to the difference between Key's stock price and his strike price, then, as soon as Key received Eustace's notice and payment, he was entitled to receive and Key was obligated to furnish stock certificates. Regardless of when the actual transfer of stock certificates transpired, this conversion of contractual

14

rights into a definitive obligation is a sale. *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1129 (9th Cir. 2002) ("if a person contracts to sell a security, that contract is a 'sale' even if the sale is never consummated"). Because any stock option exercise would be a prohibited securities transaction, Key is correct that any damage claim for lost options is barred as a matter of law. Key's second issue is sustained. This holding makes it unnecessary to address Eustace's cross-appeal challenging the trial court's calculation of lost option damages.

C. *Eustace's Motion for Sanctions.*

Eustace filed a motion for sanctions in this court contending that statements in Key's briefs were misleading. Eustace's motion was predicated upon a document that was produced by Key in a separate lawsuit, was accompanied by documents that are outside our record, and relies upon the premise that Key wrongfully failed to produce material in response to discovery in this suit. We have previously indicated to counsel that we cannot rule upon this motion because it involves matters beyond our record and because it would require fact finding. We are, therefore, remanding Eustace's motion to the trial court to determine whether sanctions are appropriate and, if so, to determine the appropriate sanction.

IV. *Holding*

The judgment of the trial court is affirmed in part and reversed and rendered in part. That portion of the trial court's judgment awarding Eustace breach of contract damages, including attorney's fees for trial and the conditional award for attorney's fees on appeal, is affirmed. That portion of the judgment awarding Eustace lost options damages is reversed, and judgment is rendered that he take nothing. Eustace's motion for sanctions is remanded to the trial court for resolution.

RICK STRANGE

JUSTICE

April 30, 2009

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

15