**Affirmed in part; Reversed and Rendered in part and Opinion Filed November 9, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00682-CV**

**BB FIT, LP D/B/A MATTISON AVENUE SALON SUITES AND SPA AND MATTISON AVENUE HOLDINGS CONSOLIDATED, LLC, Appellants**
**V.**
**EREP PRESTON TRAIL II, LLC, KENNETH ASELTON, AND ASELK CONSULTING, LLC, Appellees**

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-20-12409**

## OPINION

Before Justices Partida-Kipness, Reichek, and Breedlove
Opinion by Justice Breedlove

In this appeal, we consider the "inability to perform" provision of a commercial lease and its application during the COVID-19 pandemic. The tenant and its guarantor appeal the trial court's summary judgment for the landlord, contending that the provision was triggered and the obligation to pay rent was excused when government orders temporarily shut down businesses to protect against the spread of the COVID-19 virus. For the reasons we discuss, we conclude that the inability to perform provision did not excuse the obligation to pay rent, but

rather, it deferred the payment due date during the time the government shutdown orders were in effect.  Therefore, the tenant and guarantor failed to present evidence of an event excusing the failure to pay rent, and we accordingly affirm the trial court's judgment awarding damages and attorney's fees to the landlord.

We further conclude that although summary judgment dismissing the tenant's tort claims against a replacement tenant[1] and its principal was proper, there was no basis for an award of attorney's fees. We reverse the award of attorney's fees to the replacement tenant and its principal and render judgment accordingly.

## BACKGROUND

Appellant BB FIT, LP d/b/a Mattison Avenue Salon Suites and Spa (BB FIT) was the tenant under a retail lease dated March 13, 2017 (Lease), for commercial premises at the Preston Trails Village shopping center in Dallas. BB FIT, in turn, subleased beauty salon suites at the premises to stylists who paid weekly rent to BB FIT. The permitted form of sublease, attached as Exhibit I to the Lease, provided that if the Lease were terminated for any reason, the sublease "shall terminate simultaneously."

Section 24 of the Lease, "Defaults by Tenant," provided that failure to pay "an installment of Rent or any other expense required to be paid by Tenant" "shall constitute a material default and breach of this Lease" if the failure "continue[d] for

---

[1] Due to a subsequent dispute, this party never took possession of the premises.

a period of ten (10) days after written notice from Landlord that such payment is past due." But the Lease also contained a provision addressing "Permitted Delays" in the payment of rent:

> § 41(k) **Inability to Perform.** Whenever a period of time is herein prescribed for action to be taken by Landlord or Tenant, neither Landlord nor Tenant shall be liable or responsible for and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions, or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord or Tenant ("Permitted Delays").

When the Lease was amended in 2018, appellant Mattison Avenue Holdings Consolidated, LLC (Mattison) signed a July 17, 2018 agreement guaranteeing BB FIT's obligations.[2] On August 28, 2018, the Lease was assigned to appellee EREP Preston Trail II, LLC (EREP), when EREP became the landlord of the premises.

As of February 2020, at least 29 stylists (Stylists) were subleasing space at the premises from BB FIT. At that time, BB FIT's base rent was $ 20,579.17 per month. As of March 9, 2020, BB FIT was current on its rental payments to EREP but was not current on all other amounts owed under the Lease. BB FIT had not paid a $25.00 stop payment charge or a $200.00 late charge incurred in January 2020 after BB FIT stopped payment on its January rent check. The $200.00 charge was imposed under § 7 of the Lease, in which the parties agreed that $200.00 "represents a fair estimate

---

[2] BB FIT and Mattison have filed a joint brief and raise the same issues; accordingly, our references to BB FIT include Mattison unless otherwise specified.

of the costs and expenses which Landlord would incur by reason of Tenant's late payment."

On March 13, 2020, Texas Governor Greg Abbott issued a Disaster Proclamation under Texas Government Code § 418.014 for all counties in Texas due to the spread of the COVID-19 novel coronavirus.[3] On March 21, 2020, Dallas County Judge Clay Jenkins entered an executive order requiring all beauty salons to close.[4] BB FIT complied with these orders and closed the premises.

In a letter dated March 29, 2020, BB FIT requested from EREP an excuse from its rent obligation. Referencing the governmental orders and noting that "the impossibility and impracticability of continued work at the Premises constitute a *force majeure* event," BB FIT requested that EREP "receive this letter as an extension of the time periods for all of Tenant's obligations under the Lease for the duration of such delays or disruptions related to the pandemic. Please also receive this letter as a full abatement of Rent for the duration of such delays or disruptions related to the pandemic."

By letter of April 9, 2020, EREP notified BB FIT that "Landlord will defer but not excuse Tenant's payment of rent per Section 41(k)" of the Lease. The letter continued:

---

[3] The Governor of the State of Texas, Proclamation No. 41-3720, 45 Tex. Reg. 2094 (2020).

[4] Amended Order of Dallas County Judge Clay Jenkins issued March 21, 2020, https://www.dallascounty.org/covid-19/county-judge/past-orders/march-past-orders.php (ordering closure of beauty salons and all "other non-medical, personal care services that cannot be provided while maintaining six feet of distance").

As set forth in Section 41(k) of the Lease, Landlord's deferment does not excuse Tenant's obligation to fully and timely pay rent or other amounts owed pursuant to the Lease that accrue; instead, the deferment provides Tenant an extension of time to perform before Tenant is in default for non-payment. Tenant's obligation to fully and timely pay all amounts owed, including all amounts accrued during this deferment, will resume once the governmental law, regulation, or restriction resulting in Tenant's closure has been removed, rescinded or ceases.

Failure to pay all amounts owed following any applicable notice and cure period will constitute an event of default, and Landlord shall be permitted to exercise any remedy available under the Lease, at law, or in equity. Further, Landlord's deferment of rent under Section 41(k) does not in any way amend, modify, or alter the Lease.

Under the Governor's order of May 5, 2020, salons were permitted to reopen beginning on May 8, 2020, subject to social distancing.[5] Referencing the Governor's order, EREP demanded on May 8, 2020 that BB FIT pay April and May rent in full within ten days. BB FIT did not comply with this demand, nor did it pay any rent in June or July.

On July 31, 2020, EREP sent BB FIT a notice of default, demanding payment of $80,151.45 for April, May, June, and July rent within ten days. EREP declared its intent to file suit to recover the amounts due under the Lease and stated it "may seek to evict Tenant from the premises." BB FIT did not pay any rent under the Lease after March 9, 2020.

---

[5] *See* The Governor of the State of Texas, Executive Order No. GA-21, 45 Tex. Reg. 3181–84 (2020) (Order of May 5, 2020, at ¶ 12, providing in part that "'Reopened services' shall consist of the following to the extent they are not already 'essential services:' . . . . Starting at 12:01 a.m. on Friday, May 8, 2020: a. Cosmetology salons, hair salons, barber shops, nail salons/shops and other establishments where licensed cosmetologists or barbers practice their trade; provided, however, that all such salons, shops, and establishments must ensure at least six feet of social distancing between operating work stations.").

Meanwhile, in July or August 2020, EREP began seeking a replacement tenant for the premises. EREP selected appellee Aselk Consulting, LLC (Aselk), with previous experience operating salon-suite businesses in the area. Appellee Kenneth Aselton is Aselk's principal. Aselk and EREP executed a lease for the premises to be effective September 2, 2020, following termination of the BB FIT lease. Following the execution of the Aselk lease, Aselton visited the premises on September 3, 2020, and spoke with some of the Stylists.

On September 2, 2020, EREP delivered a "Notice of Termination of Lease and Subleases, Demand for Possession of Premises, and Notice to Vacate" to BB FIT, Mattison, and their counsel, and posted the notice on the door of the premises. Citing "Tenant and Guarantor's failures to pay past-due rent in the present amount of $121,309.79 following written notice of default and opportunity to cure," EREP demanded surrender of the premises by BB FIT and its sublessees.[6] EREP imposed deadlines for removing BB FIT's property and vacating the premises, and agreed to apply a $50,000 offset to the amounts due if BB FIT timely complied. EREP also posted a security guard at the door of the premises.

On the same day, EREP filed this suit against BB FIT and Mattison, alleging a breach of contract claim for unpaid rent against BB FIT and a breach of guaranty claim against Mattison.

---

[6] Under Lease § 30(a) and Exhibit I, "[i]f the [Lease] is terminated for any reason," the subleases "shall terminate simultaneously."

–6–

BB FIT's counsel responded by letter on September 4, 2020, noting the parties' "good-faith dispute as to the amount of rent currently due" for April and May 2020 and BB FIT's previous offer "to pay in full the rent not in dispute." BB FIT stated that it "remains willing to pay all undisputed rent owed at this time," and to pay the April and May rent into the registry of the court "should formal litigation become necessary."

BB FIT's counsel also complained of "a man identifying himself as 'Ken'" who entered the premises on September 3, approached several of the individual stylists and "claimed to be the 'new owner' of the salon," and a security guard who "appeared at the door of the Premises in an apparent effort to intimidate stylists." BB FIT demanded that "these individuals immediately cease and desist visiting the premises" and gave "formal notice to Landlord to immediately cease any further interference with Tenant's contractual relationship with the stylists."

On September 8, 2020, EREP filed an eviction proceeding in Dallas County, and the justice court awarded EREP possession of the premises on September 28, 2020. BB FIT continued in possession of the premises until October 31, 2020.

On October 5, 2020, BB FIT filed its answer in this lawsuit and asserted affirmative defenses of duress, impossibility, and frustration of purpose. BB FIT also alleged counterclaims against EREP for breach of contract, tortious interference, and conspiracy, and sought a declaratory judgment that performance was excused under

§ 41(k) of the Lease. BB FIT also filed third-party claims against Aselk and Aselton for tortious interference and conspiracy.

EREP filed a traditional and no-evidence motion for summary judgment. BB FIT responded to EREP's motion and also sought summary judgment on its counterclaims. The trial court granted EREP's motion and denied BB FIT's. The trial court also granted Aselk and Aselton's traditional and no-evidence motion for summary judgment and awarded attorney's fees to EREP, Aselk, and Aselton.

This appeal followed. In six issues, BB FIT challenges the trial court's judgment, contending the trial court erred by:

(1) granting summary judgment for EREP because BB FIT established its defense under § 41(k) of the Lease as a matter of law,

(2) awarding attorney's fees to EREP,

(3) granting summary judgment for EREP on BB FIT's breach of contract counterclaim,

(4) denying BB FIT's motion for partial summary judgment on BB FIT's breach of contract counterclaim,

(5) granting summary judgment for EREP, Aselk, and Aselton on BB FIT's tortious interference and conspiracy counterclaims, and

(6) awarding attorney's fees to Aselk and Aselton.

## STANDARD OF REVIEW

We review a trial court's decision to grant a motion for summary judgment de novo. *Helix Energy Sols. Grp., Inc. v. Gold*, 522 S.W.3d 427, 431 (Tex. 2017). "We review the evidence presented in the motion and response in the light most favorable

to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

To prevail on a traditional motion for summary judgment, the movant has the burden to demonstrate that no genuine issue of material fact exists and judgment should be rendered as a matter of law. TEX. R. CIV. P. 166a(c). "When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

## DISCUSSION

Our review of the trial court's summary judgments must include, among other issues, determining whether EREP established as a matter of law that rent was due for the months of April through September of 2020. We cannot affirm the trial court's judgment that includes rent for the months of April and May 2020 without determining whether rent was either excused or deferred for those months. For that purpose, we must construe Lease § 41(k), because BB FIT relied on that provision in both its own motion for summary judgment and its response to EREP's motion, to support its argument that no rent was due. In our analysis, we conclude the

government shutdown order triggered § 41(k) of the Lease and temporarily deferred the obligation to pay rent; it did not excuse BB FIT's payment obligation.

## A. Breach of contract[7] (Issues 1, 3, and 4)

In its first, third, and fourth issues, BB FIT argues the trial court erred by granting summary judgment for EREP and denying summary judgment for BB FIT on their respective claims for breach of the Lease. BB FIT argues it established both its counterclaim for breach of contract and its defense to EREP's claims "because the undisputed evidence demonstrated EREP failed to abide by the Lease's Inability-to-Perform provision" in § 41(k). BB FIT also contends it raised fact issues on its common-law defenses of impossibility, impracticability, and frustration of purpose due to the government orders in response to the COVID-19 pandemic.

"Generally speaking, a force majeure clause is a contractual provision allocating the risk of loss if performance becomes impossible or impracticable, especially as a result of an event or effect that the parties could not have anticipated or controlled." *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 805 (Tex. 2023) (internal quotation and footnote omitted). "Force majeure clauses, however, come in many shapes, sizes, and forms." *Id.* at 806. "The application of a particular force majeure clause depends on the terms the contracting

---

[7] Our discussion here also encompasses EREP's claim against Mattison for breach of guaranty, because Mattison argues its liability is dependent on BB FIT's. *See Gold's Gym Franchising LLC v. Brewer*, 400 S.W.3d 156, 160 (Tex. App.—Dallas 2013, no pet.) (claim for breach of guaranty includes establishing liability on the underlying contract).

–10–

parties freely chose, and each clause must be construed according to its own terms." *Id.* at 806–07. "'The scope and effect of a 'force majeure' clause depends on the specific contract language, and not on any traditional definition of the term.'" *Id.* at 807 n.32 (quoting *Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied)). "[W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure, and reviewing courts are not at liberty to rewrite the contract or interpret it in a manner which the parties never intended." *Id.* (quoting *Allegiance Hillview, L.P. v. Range Tex. Prod., LLC*, 347 S.W.3d 855, 865 (Tex. App.—Fort Worth 2011, no pet.) (internal quotation marks omitted)).

BB FIT contends the March 2020 governmental orders are "governmental laws, regulations or restrictions" and the COVID-19 pandemic is an "act[ ] of God" within Lease § 41(k). BB FIT argues that "neither it nor its Stylists could legally operate their business while these orders were in effect," and "would-be customers" similarly could not "leave home for 'non-essential' matters such as a salon visit." BB FIT argues that the pandemic and government orders were beyond its reasonable control as "specifically contemplated by the Lease." BB FIT accordingly concludes that "[t]he undisputed evidence established BB FIT's inability to perform" its obligations under the Lease.

EREP responds that § 41(k) does not "excuse" lease obligations; instead, it "extend[s] the time within which BB FIT would otherwise be in default for nonpayment." EREP contends that "[o]nce the circumstances end that prevent performance, accrued rent must be paid within the time period required by the Lease," and the circumstances preventing performance ended following Executive Order GA-21. In other words, § 41(k) is a tolling provision. It does not prevent the rent from becoming due; rather, it extends the deadline for payment.

"If [a] written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id.* at 394. A contract is ambiguous "when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Id.* at 393.

We conclude that § 41(k) tolls, rather than excuses, BB FIT's contractual obligation to pay rent, and is unambiguous. *See id.* Therefore, BB FIT's contractual obligation to pay rent "on the first day of each month in advance" was tolled, and the time during which the shutdown orders were in effect was "excluded from the computation" of time for determining when rent was due under the Lease. The section begins with the phrase, "[w]henever a period of time is herein prescribed for

–12–

action to be taken," and continues by specifying "delays" that "shall be excluded from the computation of any such period of time." The sentence concludes by designating these delays as "Permitted Delays." Nothing in § 41(k) or in the Lease "as a whole" relieves BB FIT of its obligation to pay rent altogether. *See Coker*, 650 S.W.2d at 393–94.

The parties disagree on how long the "Permitted Delays" tolled BB FIT's obligation to pay rent after the government orders were lifted. EREP demanded rent in May while BB FIT argues its pandemic-related inability to pay rent continued indefinitely. But there is no dispute that (1) on September 2, 2020, BB FIT had not paid any rent since March, and has not paid any rent since, (2) there was no government shutdown order in effect on either July 31, 2020, when EREP sent BB FIT a notice of default, or September 2, 2020, when EREP delivered a notice of termination of the Lease and subleases and filed this suit, and (3) the Lease afforded EREP the right to terminate for nonpayment of rent. Accordingly, there was no genuine issue of material fact that BB FIT was in default under the Lease at the time EREP sent its notice of termination on September 2, 2020.

BB FIT relies on *In re Hitz Restaurant Group*, 616 B.R. 374, 377–78 (Bankr. N.D. Ill. 2020), in support of its argument that because the "sudden, government-mandated forced cessation of operations and revenues" was "the proximate cause of its inability to pay rent," § 41(k) excused the obligation. In that bankruptcy proceeding, the court concluded that a force majeure clause in the debtor's lease

partially excused the debtor's obligation to pay rent for the three months its restaurant operations were limited by a government order to take-out, pick-up, and delivery services. *Id.* at 378–79. And although the force majeure clause provided that "[l]ack of money shall not be grounds for Force Majeure," the court rejected the creditor's argument that the debtor's failure to pay rent was proximately caused by lack of money. *Id.* The court agreed "at least in part" with the debtor that the government shutdown orders were the proximate cause of the debtor's "inability to generate revenue and pay rent." *Id.* Unlike § 41(k), however, the lease's force majeure clause provided that "Landlord and Tenant *shall each be excused from performing its obligations or undertakings provided in this Lease*, in the event, but only so long as the performance of any of its obligations are prevented or delayed, retarded or hindered by . . . laws, governmental action or inaction, [or] orders of government." *Id.* at 376–77 (emphasis added). Further, the court's decision that the debtor should pay 25 percent of the base rent for the three months the government orders were in place was to resolve a creditor's motions under provisions of the bankruptcy code that are not at issue in this case. *See id.* at 376 (creditor filed motions for payment of post-petition rent and to modify the automatic stay). Accordingly, we disagree that *In re Hitz* is instructive here.

BB FIT also argues that fact issues exist as to (1) whether the failure to pay "the supposed $ 225.00 balance was de minimis and immaterial when compared to the full monthly rental obligation," and accordingly did not constitute a default,

(2) whether EREP "breached the Lease by contracting with replacement tenant Aselk, and further coordinating with Aselk and Aselton's efforts to poach BB FIT's Stylists," and (3) whether EREP was in default under the Lease "for failing to provide a safe, well-lighted common area." We disagree.

First, under the Lease, BB FIT's failure to pay "any other expense required to be paid by Tenant," after ten days' notice, constituted "a material default" under § 24. And in any event, EREP did not terminate the Lease based only on the failure to pay the $ 225.00 in fees; its notice of termination was sent after six months of unpaid rent had accrued. Second, as we discuss below, BB FIT was already in default when EREP began discussions with Aselk and Aselton. Lease § 25, "Landlord's Remedies," permitted EREP to enter the premises in the event of default. EREP was also required to "use good faith reasonable efforts to relet" the premises after the tenant's default. Third, BB FIT does not cite any evidence raising a fact issue about the common area.[8] Accordingly, these matters did not present genuine issues of material fact precluding summary judgment for EREP.

---

[8] In its reply brief, BB FIT argues "there was summary judgment evidence that EREP was in default under Section 13 of the Lease for failing to provide a safe, well-lighted common area." The only support BB FIT cites for this argument, however, is a February 20, 2020 letter from EREP's counsel to BB FIT denying any default and explaining that EREP "has provided" a "safe, well-lit, sightly, and sanitary common area in accordance with good and accepted practices consistent with similarly situated first class shopping centers," including an upgrade to the lighting in December 2019.

BB FIT also relies on the common law defenses of impossibility, impracticability, and frustration of purpose[9] in support of its arguments that (1) it was excused from paying rent for the months of April through September of 2020, and (2) it raised fact issues precluding summary judgment for EREP. *See Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) ("If the party opposing a summary judgment relies on an affirmative defense, he must come forward with summary judgment evidence sufficient to raise an issue of fact on each element of the defense to avoid summary judgment.").

"The question of impossibility 'is generally considered to be one of law rather than fact.'" *EM Bldg. Contractors Servs., LLC*, *v. Byrd Bldg. Servs., LLC*, No. 05-19-00153-CV, 2020 WL 4592791, at *13 (Tex. App.—Dallas Aug. 11, 2020, no pet.) (mem. op.) (quoting RESTATEMENT (SECOND) OF CONTRACTS, ch. 11, introductory note (1981)). "However, in Texas, defenses to breach of contract are generally considered questions for the jury unless the facts are uncontested." *Id.*

These defenses are addressed in the *Restatement (Second) of Contracts*, § 261, "Discharge by Supervening Impracticability."[10] Section 261 provides:

---

[9] As BB FIT has noted, these terms are interchangeable. *See, e.g.*, *EM Bldg. Contractors Servs., LLC v. Byrd Bldg. Servs., LLC*, No. 05-19-00153-CV, 2020 WL 4592791, at *12 (Tex. App.—Dallas Aug. 11, 2020, no pet.) (mem. op.) ("[T]he terms 'impracticability' and 'impossibility' are interchangeable."); *Key Energy Servs., Inc. v. Eustace*, 290 S.W.3d 332, 339 (Tex. App.—Eastland 2009, no pet.) ("The impossibility defense has been referred to by Texas courts as impossibility of performance, commercial impracticability, and frustration of purpose.").

[10] The Supreme Court of Texas has discussed and applied § 261 and related provisions in considering impossibility and impracticability of contract performance. *See, e.g., Centex Corp. v. Dalton*, 840 S.W.2d 952, 954 (Tex. 1992).

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

RESTATEMENT (SECOND) OF CONTRACTS § 261 (AM. L. INST. 1981). Comment a to this section explains that "[t]he principle, like others in this Chapter, yields to a contrary agreement by which a party may assume a greater as well as a lesser obligation." *Id.* cmt. a. Here, the parties expressly agreed that delays due to enumerated causes beyond the parties' reasonable control would be excluded from computations of time. They did not agree to discharge BB FIT's obligation to pay rent; to the contrary, Lease § 4(d) provides that "[t]he obligation of Tenant to pay Rent and the obligations of Tenant to perform other covenants and duties hereunder constitute independent and unconditional obligations of Tenant to be performed at all times as provided hereunder." We conclude these express terms govern, specifically providing for an extension of time to pay rent rather than a discharge of the obligation.

Further, where the impracticability of performance or frustration of purpose is only temporary, the obligor's duty to perform is "suspend[ed] . . . while the impracticability or frustration exists but does not discharge his duty or prevent it from arising." RESTATEMENT (SECOND) OF CONTRACTS § 269.[11] Here, it is

---

[11] Section 269 also provides that an obligor's duty may be discharged after the cessation of the temporary impracticability or frustration if performance "would be materially more burdensome than had there been no impracticability or frustration."

–17–

undisputed that beauty salons were permitted to reopen on May 8, 2020, and that BB FIT remained in the premises until September or October 2020 without paying any rent.

Accordingly, we conclude the trial court did not err by granting EREP's motion for summary judgment and denying BB FIT's. We overrule BB FIT's first, third, and fourth issues.

## B.  Attorney's fees award to EREP (Issue 2)

In its second issue, BB FIT contends that because the trial court erred by granting summary judgment to EREP on its claims for breach of contract and breach of guaranty, it was error to award EREP its attorney's fees. We have concluded, however, that the trial court did not err by granting summary judgment for EREP on its breach of contract and breach of guaranty claims.

The Lease provided that if either party brought suit "arising out of this Lease," including suits for rent or possession of the premises, "the unsuccessful party shall pay the successful party its commercially reasonable costs incurred in connection with and in preparation for said action, including its attorneys' fees." Mattison's guaranty also included a provision requiring payment to EREP "for all costs and expenses (including reasonable attorney fees and legal expenses) incurred by Landlord in connection with the successful enforcement of this Guaranty in any litigation . . . proceedings." The trial court did not err by ruling that EREP could

recover its reasonable attorney's fees from BB FIT and Mattison. We overrule this issue.

## C.  BB FIT's counterclaims for tortious interference and conspiracy (Issue 5)

In its fifth issue, BB FIT contends the trial court erred by granting summary judgment for EREP, Aselton, and Aselk on BB FIT's tortious interference and conspiracy counterclaims. In its operative counterclaim, BB FIT pleaded that the Stylists' subleases were existing contracts subject to interference, and that EREP, Aselton, and Aselk committed "numerous willful and intentional acts of interference with the Subleases, including but not limited to trespass on the Premises, representing himself as the 'new owner' of the Premises, instructing Stylists not to pay rent, instructing Stylists to close bank accounts, and other unlawful conduct to precipitate a breach of the Subleases." BB FIT's civil conspiracy claim arises from the same allegations.

***Tortious Interference.*** As movants, EREP, Aselton, and Aselk bore the burden to disprove the elements of BB FIT's claim for tortious interference: (1) the existence of a valid contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) proximately causing BB FIT's injury, and (4) causing actual damages or loss. *See Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). BB FIT contends EREP, Aselton, and Aselk failed to meet this burden, and also argues that they did not establish the

affirmative defense of justification. *See id.* at 697 (affirmative defense of justification may be based on exercise of either one's own legal rights or a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken).

In *Hansen*, the court also explained that "[t]o prove the willful and intentional interference element of a tortious interference claim, the plaintiff must show that the defendant was legally capable of tortious interference." *Id.* at 690. "To be legally capable of tortious interference, the defendant must be a stranger to the contract with which he allegedly interfered." *Id.*

BB FIT contends it raised genuine issues of material fact on its tortious interference claim. First, BB FIT argues it raised a fact issue whether EREP was a stranger to the subleases, pointing to evidence that each Stylist was a tenant of BB FIT, had signed a sublease with BB FIT, and paid weekly rent to BB FIT. But BB FIT does not dispute the evidence that the Lease expressly provided the terms, conditions, and forms for all subletting by BB FIT.

In the alternative, BB FIT argues that even if EREP could not tortiously interfere with the subleases, it could interfere with the Stylists' direct deposit agreements with BB FIT, separate contracts to which EREP was not a party. Even if we accept this contention, BB FIT had no further right to collect rent from the Stylists once EREP terminated the Lease. Section 30 of the Lease required BB FIT to use the form attached as Exhibit I for all of its subleases. Paragraph 1(e)(ii) of

Exhibit I provides that "[i]f the Primary Lease is terminated for any reason, this Sublease shall terminate simultaneously and [BB FIT] and [Stylist] shall thereafter be relieved of all further obligations under this Sublease" except the Stylist's failure to cure previous defaults. Accordingly, when EREP terminated the Lease and Subleases, BB FIT had no further rights under the Stylists' direct deposit agreements with which EREP, Aselk, or Aselton could have interfered. *See Hansen*, 525 S.W.3d at 689 (claim for tortious interference requires existence of contract subject to interference).

Second, BB FIT argues that EREP did not conclusively establish its justification or privilege defense. BB FIT contends EREP was not exercising its own legal rights or any good faith claim to a colorable legal right because (1) it was acting in violation of Lease § 41(k) by demanding rent and (2) it was not acting in good faith by conspiring with Aselk and Aselton to interfere with BB FIT's business. We have already concluded that EREP did not violate § 41(k) of the Lease by demanding rent. As we have discussed, § 41(k) extended the due date for rent payments but did not cancel the obligation. Accordingly, EREP established that it was exercising its own legal rights under the Lease.

Further, Aselton's entry into the premises and alleged intimidation of the Stylists did not occur until September 3, 2020, after EREP gave BB FIT and Mattison notice of termination of the Lease. Although BB FIT pleaded and offered evidence that EREP's discussions with Aselton and Aselk began in the summer of

2020, the alleged "intimidation campaign" of the Stylists did not begin until "early September 2020," according to BB FIT's own operative pleading and supporting evidence. As EREP argues, "every complained-of act," including posting a security guard at the premises, Aselton's entry into the premises, and Aselton's communications with Stylists, occurred after EREP terminated the Lease. EREP concludes that at the time of these acts, there was no contract with which EREP, Aselton, and Aselk could interfere.

In addition, when Aselton and Aselk's discussions with EREP began, BB FIT had not paid rent for several months. Accordingly, § 25(a)(i) of the Lease permitted termination by EREP. "Ordinarily, merely inducing a contract obligor to do what it has a right to do under the subject contract is not actionable interference." *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 670 (Tex. App.—Dallas 2004, pet. denied). "To establish an actionable willful and intentional act the evidence must show the defendant's influence and knowing inducement of the contract obligor's wrongful action. Evidence showing that the defendant was a mere willing participant does not suffice." *Id.* at 671 (internal quotations and citation omitted). Without a wrongful action by EREP, Aselton and Aselk's July and August negotiations and agreement to lease the premises beginning in September were not actionable interference. *See id.* at 670–75; *see also Fan Expo, LLC v. Nat'l Football League*, No. 05-17-01304-CV, 2019 WL 2211084, at *4 (Tex. App.—Dallas May 22, 2019, pet. denied) (mem. op.) ("To establish the element of a willful and intentional act of

interference, a plaintiff must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under a contract.").

Third, BB FIT argues there is a fact issue whether the Lease was terminated on October 29, 2020, not on September 2, 2020. BB FIT relies on testimony by Tucker Gagen, Mattison's Vice President of Operations that "[o]n or about October 29, 2020, BB FIT gave EREP notice of its termination of the BB FIT Lease and its intent to vacate the Premises by October 31, 2020, which BB FIT did." But there is no dispute that EREP gave BB FIT notice of termination on September 2, 2020, by email, certified mail, and by posting on the door of the premises. In its September 2, 2020 letter, EREP notified BB FIT and Matteson "that Landlord is terminating the Lease for the Premises and all Subleases for the Premises, effective immediately, as a result of Tenant and Guarantor's failures to pay past-due rent in the present amount of $121,309.79 following written notice of default and opportunity to cure." Although EREP stated in the letter that BB FIT had additional periods of time to vacate the premises and remove personal property and other items, EREP also required "immediate[ ] surrender of the Premises." Gagen's testimony about the date of BB FIT's notice of termination did not create a fact issue whether EREP had terminated the Lease—and, accordingly, the subleases—two months previously.

Fourth, BB FIT contends it presented evidence of damages, pointing to Gagen's testimony that "between April and August 2020, BB FIT lost at least $73,000 in cash collections from tenants as a direct result of COVID-19 disruptions."

BB FIT also relies on Gagen's testimony that the loss of BB FIT's subtenants resulted in a 70 percent drop in revenue by September 2020 and a loss of $1 million in business value. Without evidence of a willful and intentional act of interference that caused these damages, however, this testimony did not raise a material fact issue precluding summary judgment on BB FIT's tortious interference claim. *See Hansen*, 525 S.W.3d at 689. We conclude the trial court did not err by granting summary judgment for EREP, Aselton, and Asek on BB FIT's claims for tortious interference.

*Conspiracy*. Because BB FIT failed to raise a genuine issue of material fact on an underlying tort, summary judgment was also proper on its conspiracy claim. A civil conspiracy involves a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. *W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 920 (Tex. App.—Dallas 2014, pet. denied) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). "Conspiracy is a derivative tort because a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Id.* (internal quotation omitted). If the trial court correctly grants summary judgment against the claimant on the underlying tort, there is no independent liability for civil conspiracy. *Id.*

Here, as we have discussed, the trial court correctly granted summary judgment on BB FIT's claim for tortious interference with contract. Accordingly,

there is no underlying tort in which EREP, Aselk, and Aselton participated, and no independent liability for civil conspiracy. *See id.* We overrule BB FIT's fifth issue.

## D. Attorney's fees award to Aselk and Aselton (Issue 6)

In its sixth issue, BB FIT contends the trial court erred by awarding attorney's fees to Aselk and Aselton. BB FIT argues that Aselk and Aselton failed to plead they were entitled to attorney's fees on any basis other than the TCPA and no statutory or contractual basis supported the award.

Aselk and Aselton respond that their alternative prayer for attorney's fees was sufficient to support the award. They further argue that they are "innocent mitigating third part[ies]" who should be awarded their attorney's fees in the interests of justice. They cite *Knebel v. Capital National Bank*, 518 S.W.2d 795, 799 (Tex. 1974), and *Guffey v. Clark*, No. 05-93-00849-CV, 1997 WL 142750, at *3 (Tex. App.—Dallas Mar. 31, 1997, writ denied) (op. on reh'g) (not designated for publication), in support of their argument. Neither case, however, stands for the proposition that attorney's fees may be awarded when there is no statutory or contractual basis for doing so.

Aselk and Aselton cite *Knebel* to support their argument that "courts may exercise their equitable powers to award attorney fees 'when the interests of justice so require.'" *See Knebel*, 518 S.W.2d at 799. But in *Knebel*, the fee award was based on the common fund doctrine, with "the equitable objective" of "distributing the burden of [attorney's fees] expenses among those who share in an accomplished benefit." *Id.* The common fund doctrine was not at issue in this case. And in *Guffey*,

we concluded that Guffey's failure to object to a jury question on the ground that fees were not segregated between appellees' breach of contract and tort claims resulted in waiver of that complaint. *See Guffey*, 1997 WL 142750, at \*5–6. No similar waiver occurred here.

"Absent a contract or statute, trial courts do not have inherent authority to require a losing party to pay the prevailing party's fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). Accordingly, we conclude that the trial court erred by awarding attorney's fees to Aselton and Aselk. We sustain BB FIT's sixth issue.

## CONCLUSION

We reverse the trial court's award of attorney's fees to Aselton and Aselk and render judgment that Aselton and Aselk take nothing on their claim for attorney's fees. In all other respects, the trial court's judgment is affirmed.

220682f.p05

/Maricela Breedlove/
MARICELA BREEDLOVE
JUSTICE



## JUDGMENT

BB FIT, LP D/B/A MATTISON
AVENUE SALON SUITES AND
SPA AND MATTISON AVENUE
HOLDINGS CONSOLIDATED,
LLC, Appellants

No. 05-22-00682-CV      V.

EREP PRESTON TRAIL II, LLC;
KENNETH ASELTON AND
ASELK CONSULTING, LLC,
Appellees

On Appeal from the 193rd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-20-12409.
Opinion delivered by Justice
Breedlove. Justices Partida-Kipness
and Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED AND RENDERED** in part. We **REVERSE** that portion of the trial court's judgment awarding attorney's fees to appellees Kenneth Aselton and Aselk Consulting, LLC and **RENDER JUDGMENT** that appellees Kenneth Aselton and Aselk Consulting, LLC take nothing on that claim. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that appellees EREP Preston Trail II, LLC, Kenneth Aselton and Aselk Consulting, LLC recover their costs of this appeal and the full amount of the trial court's judgment from appellants BB FIT, LP d/b/a Mattison Avenue Salon Suites and Spa and Mattison Avenue Holdings Consolidated, LLC and from appellants' cash bond.

Judgment entered this 9th day of November, 2023.